**SUN OIL COMPANY OF PENNSYLVANIA, Sun International, Ltd., Appellants,**

v.

**M/T CARISLE, Her Engines, Boilers, Tackle, etc., In Rem, Ore Sea Transport S.A. of Panama, and Tradax Gestion, S.A.**

No. 84–1536.

United States Court of Appeals, Third Circuit.

Argued May 14, 1985.

Decided Sept. 4, 1985.

Francis J. Deasey (argued), Kevin J. O'Brien, Deasey, Scanlan & Bender, Ltd., Philadelphia, Pa., for appellants.

James F. Young (argued), Thomas Fisher, III, Krusen Evans and Byrne, Philadelphia, Pa., for appellees.

Raul Betancourt, Jr., Edward T. Connelly, Palmer Biezup & Henderson, Philadelphia, Pa., (Elton A. Ellison, Koch Industries, Inc., Wichita, Kan., of counsel), for amicus curiae Koch Industries, Inc.

Before HUNTER and SLOVITER, Circuit Judges, and COHEN, District Judge.[*]

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

#### Issue

This appeal represents another skirmish in the long battle between shippers, who send their goods by sea, and carriers, whose vessels transport the goods. The issue, briefly stated, concerns the existence and validity of a trade custom relieving the carrier of the responsibility for delivering 0.5% of crude oil delivered to it for transport. It is one of first impression for an appellate court.

The parties have stipulated that the Sun Oil Company of Pennsylvania and Sun International, Ltd. (jointly "Sun") chartered the M/T Carisle to transport Zarzatine crude oil from La Skhirrah, Tunisia to Marcus Hook, Pennsylvania. The ship loaded the oil on October 13, 1980, and measurements showed 540,401 barrels on board. When it arrived at Marcus Hook on October 31, measurements showed 537,566 barrels on board. Sun then filed a complaint in admiralty against the ship in rem and against Ore Sea Transport, S.A. of Panama, the time charter owner,[1] in personam, later amended to include Tradax Gestion, S.A., the owner, in personam, seeking damages for the missing 2835 barrels of oil.

The present case is one of four similar cases filed by Sun in 1980 and 1981 in the same district court. In each case, one of the defendants raised the affirmative defense that by custom and practice the carrier has a 0.5% trade allowance, which was an implied term in the charter party contract. Pursuant thereto, unexplained losses of less than 0.5% do not give rise to any claim against the carrier, and unexplained losses of more than 0.5% give rise to claims only for the amount by which the loss exceeds that figure. Thus, the carrier would be obligated to deliver only 99.5% of the oil loaded unless the loss was due to some specific, known cause, such as a collision, in which case the allowance would not apply.

Pursuant to a stipulation of counsel for all parties, approved by the three district court judges to whom these cases were assigned, the four cases were consolidated for an evidentiary hearing before a panel consisting of those three judges. App. at 268–71. After hearing the testimony and receiving the documentary evidence submitted on the alleged trade custom, the judges ruled that a custom as alleged was proven and was an implied term in the contracts at issue. *Sun Oil Co. of Pennsylvania v. M/T Mercedes Maria,* 1983 A.M.C. 718 (E.D.Pa.1982) (as amended January 24, 1983).[2] The cases were then severed, and returned to the individual judges for disposition.[3]

Cross motions for summary judgment were filed in this case. The district court, finding the "oil shipping industry's customary 0.5% trade allowance [to be] controlling," App. at 127, gave summary judgment for the defendants. Sun was awarded recovery only for 133 barrels of oil, the

---

[*] Honorable Mitchell H. Cohen, United States District Court for the District of New Jersey, sitting by designation.

1. Ore Sea is not participating in this appeal pursuant to a stipulation of dismissal with prejudice signed by all parties and approved by the district court. App. at 130–31.

2. This opinion will be referred to throughout as the opinion of the district court judges. The citation A.M.C. refers to the American Maritime Cases series of reports.

3. The three other cases were: *Sun Oil Co. of Pennsylvania v. M/T Mercedes Maria,* No. 80–

4862; *Sun Oil Co. of Pennsylvania v. M/T Mercedes Maria,* No. 81–1033; and *Sun Oil Co. of Pennsylvania v. Robina Shipping, Inc.,* No. 81–1083, all filed in the Eastern District of Pennsylvania. The three-judge panel denied Sun's motion for certification of the question pursuant to 28 U.S.C. § 1292(b) (1982) before returning the cases to the individual judges. App. at 267. The other three cases have apparently been concluded, but the record before us provides no further information as to the use of the three judge opinion in the disposition of these cases.

amount by which its loss of 2835 barrels of oil exceeded 0.5% of the cargo.

In its appeal, Sun argues first that the Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300 *et seq.* (1982) (COGSA), precludes the implication of the alleged custom into the contract; second, that certain factual determinations of the district judges were clearly erroneous; and third, that the judges erred in the legal standards they applied to the facts in determining that the custom alleged was an implied term in the contract. We first summarize the holding of the district court and then turn to Sun's COGSA argument, which we find dispositive.

## II.

### *The Holding of the District Court*

The district court judges explained that the 0.5% customary trade allowance in the bulk oil transportation industry developed because of inexact measurement and inevitable loss associated with the transportation of liquid cargoes. 1983 A.M.C. at 719. To measure the amount of oil in a tanker, one drops a tape measure into each tank to determine the "ullage," i.e., the degree to which the tank is *not* full. The measurement may be imprecise because of factors such as human error, rolling of the vessel, its failure to lie level in the water, physical changes in the dimensions of the cargo tanks, and variation of the volume of the oil with temperature.[4] Although the court noted that ships generally employ conversion tables that correct for the degree to which the ship is not level and for the variations in temperature, it characterized measurement as an art rather than an exact science. *Id.* at 720. It also explained

that actual loss of cargo may occur due to clingage, settlement, sedimentation and evaporation, which result from the inherent properties of oil as a cargo. *Id.* at 720–21.

The court stated that under the measurement techniques and transport methods in existence at the earliest days of bulk oil carriage by sea, "sound reasons ... did exist" for the custom of a trade allowance. *Id.* at 721, 727.[5] The court did not directly meet Sun's contention that improved methods of measurement have made application of the custom unreasonable now. It stated merely that, "it would be desirable if more sophisticated and exact cargo measurement technology might be available to the industry in the future, so that disputes of this type might be avoided." *Id.* at 727.

The court determined that there was an enforceable customary trade allowance by applying legal standards from the Uniform Commercial Code § 1–205(2) and the Restatement (Second) of Contracts § 222(1).[6] Although these are not controlling in a federal maritime case such as this, the court held that because of their broad acceptance, they were appropriate standards to be used in what is essentially a commercial dispute. Both sources require a finding of "regularity of observance" sufficient to "justify an expectation" that a usage of trade "will be observed." The court found sufficient evidence to meet this standard, primarily in the testimony of the expert witnesses. 1983 A.M.C. at 724. The court also relied on evidence of attempts by Sun to negotiate "a 0.25% allowance as an express written contract term in its charter parties" to show "the *degree* to which the 0.5% allowance has been accepted and

---

4. By convention, the volume of oil is always given on the assumption that the oil is at 60° F.

5. One commentator suggests that the actual figure, 0.5%, derives from "the standard deductible used in the insurance industry on cargoes of crude oil." Thomajan, *Tanker Problems in Arbitration: The 0.5% Allowance,* 14 J.Mar.L. & Com. 225, 226 (1983).

6. The Uniform Commercial Code § 1–205(2) states, in pertinent part:

A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question.

The Restatement (Second) of Contracts § 222(1) states, in pertinent part:

A usage of trade is a usage having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to a particular agreement.

treated by those in the industry as a custom and usage of trade." *Id.* at 725 (emphasis in original).[7]

The court also rejected Sun's argument that the trade custom was inconsistent with COGSA, which establishes a statutory scheme of responsibilities with regard to carriage of cargo and for determination of liability with regard to claims for short delivery of cargo. The court reasoned that the customary trade allowance determined what the carrier was obligated to deliver in the first place. Having decided that "there is no non-delivery if the cargo is *not contractually obligated to be delivered,*" the court concluded that recognition of a trade allowance is not inconsistent with COGSA. *Id.* at 721 (emphasis in original).

### III.

#### *COGSA: History and Relevant Provisions*

COGSA "was lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924." *Robert C. Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3 L.Ed.2d 820 (1959). The Hague Rules were themselves based in part on the Harter Act of 1893, 46 U.S.C. §§ 190–196 (1982), now largely superseded by COGSA, which was passed in 1936. For accounts of the history leading to the passage of COGSA, *see, e.g.,* G. Gilmore & C. Black, *The Law of Admiralty* 139–44 (2d ed. 1975); 2A *Benedict on Admiralty* §§ 11–16 (6th ed. 1985); A. Knauth, *The American Law of Ocean Bills of Lading* 118–31 (4th ed. 1953); Yancey, *The Carriage of Goods: Hague, COGSA, Visby, and Hamburg,* 57 Tul.L.Rev. 1238, 1238–45 (1983).

Under the general law of maritime carriage, the carrier was strictly liable for cargo loss, subject to certain exceptions, such as acts of God. *See* 2A *Benedict on Admiralty, supra* at 2–1. In the nineteenth century the carriers used their superior bargaining power to insert into bills of lading clauses which exempted them from liability for loss of or damage to the cargo even if caused by their own negligence. In England, which enjoyed a preeminent position in shipping at that time, these clauses of exculpation were enforced, but the federal courts of this country held them invalid as against public policy. G. Gilmore & C. Black, *supra* at 142.

With the passage of the Harter Act of 1893, Congress sought a compromise between the opposing interests. The Act imposed an obligation of due diligence on the carrier to make the vessel seaworthy and provided that if it did so, the carrier was absolved of liability for "faults or errors" in navigation or management of the vessel. At the same time, it made unenforceable contract provisions that relieved carriers from liability for negligence in loading, storage or delivery of goods or for failure to exercise due diligence to make the vessel seaworthy. *See* 46 U.S.C. §§ 190–192 (1982). Nonetheless, English courts often refused to enforce "Harter Act clauses" when there were also contradictory exculpatory clauses in the bill of lading. *See* A. Knauth, *supra* at 122. Furthermore, carriers remained free to write in exculpatory clauses not covered by the terms of the Act. *See* 2A *Benedict on Admiralty, supra* at 2–9. *See also* Yancey, *supra* at 1240–41. Thus, momentum grew for an international agreement on uniform rules governing bills of lading which would be more favorable to shippers.

The Hague Rules, which emerged from a 1921 multinational Conference, reflected such an agreement. The Rules were re-

---

**7.** Sun contends that there is no evidence to support these findings, arguing that its experts never acknowledged the alleged custom and that the negotiations referred to by the court did not concern the alleged trade allowance but rather the shippers' right to deduct freight for cargo lost or remaining on board after discharge. It further contends that the evidence shows that, if anything, the 0.5% allowance represents a "settlement device," not a term in the contract. *See* Appellants' Reply Brief at 19–22. The district court specifically rejected this contention. 1983 A.M.C. at 725 n. 2. As noted previously in the text, we do not reach these arguments.

fined and put in legislative form by the International Conference on Maritime Law in a series of meetings held in Brussels between 1921 and 1924. The United States took a leading role in this process, and the Hague Rules are based in large part on the Harter Act. *See* 2A *Benedict on Admiralty, supra* at § 15; A. Knauth, *supra* at 126–28.

Representatives of twenty-four countries signed the final document in Brussels in 1924. Since then, many countries have passed legislation known as Carriage of Goods by Sea Acts which are, in most pertinent respects, simply the Hague Rules.[8] Adoption of COGSA in the United States was delayed until a Supreme Court decision interpreted the Harter Act in a manner adverse to the interests of carriers.[9] Thereafter, the Act was passed as law in 1936, and the United States ratified the convention in 1937. *See* A. Knauth, *supra* at 128–30. This international agreement "define[d] by law the rights and liabilities of water carriers and shippers in foreign commerce," H.R.Rep. No. 2218, 74th Cong., 2d Sess. 1 (1936), and has done so in a way that, broadly speaking, has satisfied both shippers and carriers.[10]

COGSA applies to foreign commerce and may, by agreement of the parties through a stipulation in the bill of lading, apply to domestic voyages as well. Absent such a stipulation, the Harter Act applies to shipments by water from one port of the United States to another. *See* G. Gilmore & C. Black, *supra* at 147–48. The Harter Act also applies, even in foreign trade, while the goods are in the custody of the carrier, but before loading and after unloading. *Id.* at 148. The charter party contract at issue here specifically states that it shall have effect "subject to the provisions of

[COGSA]" and that COGSA "shall be deemed to be incorporated herein." App. at 42. Even if it did not so specify, COGSA would still apply, *see* 46 U.S.C. §§ 1300, 1312 (1982).

Section 3 of COGSA sets forth the basic obligations of the carrier, including due diligence to make the ship seaworthy and fit for the cargo to be carried, 46 U.S.C. § 1303(1), and exercise of proper care for the goods, 46 U.S.C. § 1303(2). Section 4 sets forth the rights and immunities of the carrier, 46 U.S.C. § 1304.

■ Under COGSA, the owner of the cargo makes its *prima facie* case of cargo loss by proving delivery of the cargo to the vessel in good condition and short delivery by the vessel. *Quaker Oats Co. v. M/V Torvanger,* 734 F.2d 238, 240 (5th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985). The burden then shifts to the carrier to show either due diligence or due care under section 4(2)(q) or that the loss or part thereof was due to one of the causes enumerated in section 4(2)(a)–(p) which specify causes of cargo damage or loss for which the carrier is not responsible. *Id.* at 240–41; 46 U.S.C. § 1304. *Cf. PPG Industries, Inc. v. Ashland Oil Co.—Thomas Petroleum,* 592 F.2d 138 (3d Cir.1978), *cert. denied,* 444 U.S. 830, 100 S.Ct. 58, 62 L.Ed.2d 38 (1979).

■ The specific provisions on which Sun relies for its claim of inconsistency between COGSA and the customary trade allowance enforced in this case are sections 3(2), 4(2)(m), 4(2)(q) and 3(8) of the Act. Section 3(2) provides, "The carrier shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 1303(2). Under section 4(2)(m), the carrier is not liable

---

**8.** *See generally* Chandler, *A Comparison of "COGSA", the Hague/Visby Rules, and the Hamburg Rules,* 15 J.Mar.L. & Com. 233, 289–91 (1984) (listing countries adopting Hague Rules in some form).

**9.** In *May v. Hamburg-Amerikanische Packetfahrt Aktiengesellschaft,* 290 U.S. 333, 350–54, 54 S.Ct. 162, 166–68, 78 L.Ed. 348 (1933) (*The Isis* ), the Court held that the Harter Act allowed a shipper

to recover even without a causal connection between the unseaworthiness of the vessel and loss of cargo if it could show the shipowner did not exercise due diligence in making the vessel seaworthy.

**10.** Later developments are described in Chandler, *supra* note 7 at 233–91, and Yancey, *supra* at 1246–59.

for loss resulting from "wastage in bulk or weight or any other loss or damage arising from inherent defect, quality, or vice of the goods." 46 U.S.C. § 1304(2)(m). Section 4(2)(q) is a catch-all provision which exempts the carrier from liability for damage or loss "arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier." Under this subsection, "the burden of proof shall be on the person claiming the benefit of this exception." 46 U.S.C. § 1304(2)(q). Thus, if the carrier wants to escape liability under COGSA without reference to a cause specified in section 4(2)(a)–(p), it must prove that its negligence did not contribute to the loss. The final relevant provision is section 3(8) of COGSA, 46 U.S.C. § 1303(8), which provides in pertinent part:

> Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods arising from negligence, fault, or failure

in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect.

It is Sun's position that because COGSA establishes the carrier's liabilities and responsibilities with respect to the carriage of cargo and also establishes the burden of proof concerning claims for cargo loss or damage, the district court's decision to apply a customary trade allowance contravenes both the letter and the spirit of the statute.

## IV.

### Analysis

For purposes of this opinion we treat as a factual finding the district court's determination that a 0.5% customary trade allowance existed in the oil shipping industry.[11] As such, it is subject to review under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a).[12] We assume arguendo

---

**11.** Ordinarily, the quantity of oil is measured four times: on shore before loading; on ship after loading; on ship prior to discharge; and on shore after discharge. Although the issue before us arises in the context of ullage-to-ullage losses, i.e., the difference between the measurement in the ship's tank after loading and before unloading, the opinion of the district court judges did not always distinguish between the various measurement points. Several statements suggest that they were concerned with inadequate discharge of the cargo. For example, in explaining one of the reasons for the allowance, the opinion states that "not all oil could be removed from the inner surface of the tank." *Sun Oil Co. of Pennsylvania v. M/T Mercedes Maria,* 1983 A.M.C. 718, 720 (1982).

Shore-to-shore losses present different problems than ullage-to-ullage losses, because there are the intervening steps of loading and discharge for which a party other than the carrier, such as the shore facility, may be partly responsible. *See, e.g., Esso Nederland v. M.T. Trade Fortitude,* 1977 A.M.C. 2144, 2147 (S.D.N.Y. 1977), *aff'd mem.,* 573 F.2d 1294 (2d Cir.1977). COGSA covers only the rights of shippers against carriers for cargo shipped under bills of lading, and does not purport to govern claims against independent shore facilities or others. *See Robert C. Herd & Co. v. Krawill Machinery Corp.,* 359 U.S. 297, 301–03, 79 S.Ct. 766, 769–70, 3 L.Ed.2d 820 (1959). In cargo loss cases, courts generally use the ullage-to-ullage mea-

surements because these figures are usually the best measure of the loss occurring while the cargo is, under COGSA, the carrier's responsibility. *See Amoco Oil Co. v. M/V Lorenzo Halcoussi,* 1984 A.M.C. 1608, 1614–15 (E.D.La.1983) (using shore measurements only because ullage measurements admittedly inaccurate). When shore figures are used simply as the best estimate of the *carrier's* liability for cargo loss, the issue would be the same as that presently before us.

**12.** Although we do not determine whether the factual finding is "clearly erroneous," we note that there is some support for Sun's position that this is so in light of the equivocal and conflicting testimony. The carrier's three expert witnesses testified to the existence of a 0.5% customary trade allowance, App. at 606–07 (Abugel), 787 (Palmer), 1155–56 (Kingston), but Sun raised substantial challenges to the qualifications of all three based on their lack of relevant experience negotiating charter parties or settling cargo claims. Furthermore, cross-examination and rebuttal witnesses significantly weakened the force of their testimony. Sun's witnesses testified relatively steadfastly to the unreasonableness of the 0.5% figure and to the consistent refusal of the oil companies in recent years to recognize the alleged custom, except perhaps as a basis for settlement of cargo loss claims. *See, e.g.,* App. at 347, 362 (Muccini); 883, 897 (Flanagan).

that maritime law would apply general commercial law reflected in the Uniform Commercial Code and the Restatement of Contracts to define such a custom of the trade. On the other hand, the district court judges' conclusion that such a customary trade allowance should be treated as an implied term of each contract notwithstanding COGSA is subject to our plenary review.

The court held that recognition of a trade allowance is not inconsistent with COGSA because the trade allowance was to be construed as a term of the contract of carriage. That hardly advances the analysis since the issue before us is whether COGSA precludes implying such a trade allowance into the contract. Resolution of that issue in turn depends to a large extent on the history, policy, and construction of COGSA, none of which the district court judges analyzed in their opinion.

We recognize that the 0.5% allowance has apparently remained unchallenged until relatively recently. As the district court judges noted, the motivation of shippers "to challenge the trade allowance has increased commensurate with the increase in the price of oil." 1983 A.M.C. at 720. The brief of the amicus, Koch Industries, Inc., offers the following illustration. "A standard size tanker in the 1960s was 35,000 deadweight tons (DWT) with a capacity of 262,000 barrels. At 1960s prices assuming a tanker of 35,000 DWT, the value of a 0.5 percent loss was $2,500.00. Today, the typical size of a very large crude carrier (VLCC) is 250,000 DWT with a cargo capacity of 1,875,000 barrels of oil. At today's prices with today's VLCC the value of a 0.5 percent loss may be $325,000.00." Amicus Brief at 34–35.

Other district courts have divided on whether a 0.5% allowance should be enforced. Some have refused to honor the allowance, essentially because neither the bill of lading nor the charter party refers to such an allowance. *See Esso Nederland v. M.T. Trade Fortitude*, 1977 A.M.C. at 2148. *See also Amoco Oil Co. v. M/V Lorenzo Halcoussi*, 1984 A.M.C. 1608, 1615–16 (E.D.

La.1983); *Kerr-McGee Refining Corp. v. M/V La Libertad*, 529 F.Supp. 78, 85, 1982 A.M.C. 340 (S.D.N.Y.1981). Others have given it effect without considering whether it is inconsistent with COGSA. *See Wesco International, Inc. v. M/V Tide Crown*, 1985 A.M.C. 189, 200–01 (S.D.Texas 1983); *Northeast Petroleum Corp. v. S.S. Prairie Grove*, 1977 A.M.C. 2139 (S.D.N.Y.1977). *But see Palmco, Inc. v. American President Lines, Ltd.*, 1978 A.M.C. 1715, 1722 (D.Ore.1978) (0.5% trade allowance not in conflict with COGSA because exercise of due diligence does not preclude a normal 0.5% loss). *See generally* Textor, *COGSA: Petroleum Shortage Transit Allowance: Sun Oil Company v. The Mercedes Maria*, 14 J.Mar.L. & Com. 269 (1983) (criticizing the district court's reliance on *Palmco*); Thomajan, *Tanker Problems in Arbitration: The 0.5% Allowance*, 14 J.Mar.L. & Com. 225, 228–29 (1983) (loss allowance is inconsistent with the scheme of COGSA).

The practical effect of enforcing a customary trade allowance can be illustrated by comparing the course of litigation with or without the allowance. In either instance, the shipper would first produce evidence of the amount of the short delivery, usually through a comparison of ullages taken after loading and before unloading. The carrier (vessel) would then have the burden of rebutting the prima facie case by presenting evidence that it exercised due diligence to avoid and prevent the loss. 46 U.S.C. § 1304(1), that it was free from negligence in the preparation of the ship and care and stowage of the cargo, 46 U.S.C. § 1304(2)(q), or that the loss resulted from an "excepted cause," such as the "inherent defect, quality or vice of the goods," 46 U.S.C. § 1304(2)(m). In this case, although not obliged by COGSA to do so, Sun undertook to show by expert testimony that the expected loss due to the "inherent vice" of the cargo for this particular voyage would be 704 barrels. Assuming that this were established, the carrier would, under COGSA and in the absence of the trade custom, be liable for the loss exceeding 704 barrels, which would amount to 2131 barrels at

$38.01 per barrel, or $80,999.31 plus interest.

On the other hand, if the trade allowance is enforced, the litigation would proceed as it did here. Sun proved its loss, and the carrier offered no evidence as to cause of loss, existence of a statutory exception, or its exercise of due diligence, relying instead on the 0.5% allowance, which amounted to 2702 barrels. It was, therefore, liable for 133 barrels at $38.01 per barrel, or $5,055.31 plus interest, which is the amount of the judgment entered for Sun below. The carrier might also attempt to avoid liability for the amount over 0.5% by shouldering its statutory burden of proof.

In any event, it is clear that the effect of enforcing the trade custom alters the statutorily prescribed method of litigating claims. The district court placed on the shipper the burden of proving that some specific cause, such as carrier's negligence, was responsible for the loss, rather than following COGSA's scheme which places the risk of unexplained losses on the carrier.

The legislative history shows that Congress viewed the shift in the burden of proof on negligence from the shipper to the carrier as one of the major advances of COGSA over prior law. The House Report stated:

Under present law, if the carrier can show that the loss or damage complained of was caused by one any or more of the excepted causes, the carrier is exonerated from liability unless the cargo owner can show that the negligence of the carrier or servants contributed to the loss (*Clark v. Barnwell*) [53 U.S. (12 How.) 290, 299, 13 L.Ed. 985 (1851)]....

In practice it is frequently very difficult, and often impossible, for the cargo owner to carry such a burden because, in most instances, the information is entirely in the possession of the carrier. *Under this bill*, however, *the exemption of the carrier from liability* from causes such as these and many other causes now excepted *would depend upon the carrier sustaining the burden of prov-*

*ing* that the loss or damage resulted from a cause without the actual fault or privity of the carrier or the fault or neglect of the agents or servants of the carrier. This shift in the burden of proof will constitute a tremendous advantage to cargo owners.

H.R.Rep. No. 2218, 74th Cong., 2d Sess. 8–9 (1936) (emphasis added).

As the Second Circuit noted, "[t]he burden of proof which COGSA has placed on the carrier is a major weapon in the shipper's arsenal." *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 16 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970). *See also Copco Steel & Engineering Co. v. Prins Frederik Hendrik*, 129 F.Supp. 469 (E.D.Mich.1955); *George F. Pettinos, Inc. v. American Export Lines, Inc.*, 68 F.Supp. 759 (E.D.Pa.1946), *aff'd*, 159 F.2d 247 (3d Cir.1947).

The resolution by the district court judges was to "simply stat[e], this matter is one of contract, within the power of both carriers and charterers to negotiate." *Sun Oil Co. v. M/T Mercedes Maria*, 1983 A.M.C. at 727. This resolution has some facial plausibility until it is examined in light of section 3(8) of COGSA, which renders void clauses which relieve the vessel of liability for negligence. 46 U.S.C. § 1303(8).

The statement of Gilmore & Black that, "Cogsa allows a freedom of contracting out of its terms, but only in the direction of *increasing* the shipowner's liabilities, and never in the direction of diminishing them," G. Gilmore & C. Black, *The Law of Admiralty* 145 (2d ed. 1975) (emphasis in original), has been frequently adopted in court opinions. *See, e.g., Jamaica Nutrition Holdings, Ltd. v. United Shipping Co., Ltd.*, 643 F.2d 376, 379 n. 4 (5th Cir.1981); *Mitsui & Co., Ltd. v. American Export Lines, Inc.*, 636 F.2d 807, 814 n. 6 (2d Cir.1981); *Hanover Insurance Co. v. Shulman Transport Enterprises, Inc.*, 581 F.2d 268, 273 n. 8 (1st Cir.1978); *Portland Fish Co. v. States Steamship Co.*, 510 F.2d 628, 632–33 (9th Cir.1974). The validity of

this rule is supported by an impressive array of authority. In *United States v. Atlantic Mutual Insurance Co.*, 343 U.S. 236, 239–42, 72 S.Ct. 666, 668–70, 96 L.Ed. 907 (1952), the Supreme Court held that under COGSA shipowners could not by stipulation in the bill of lading deprive cargo owners of a part of their recovery from a non-carrying ship. If this was too burdensome on carriers, their remedy was to go to Congress.

Similarly, the Second Circuit relied on section 3(8) to invalidate a clause authorizing the carrier to store goods on deck unless informed otherwise by the shipper, a clause which had the effect of absolving the carrier from risk of damage to goods so stored. *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d at 16. Such a clause was invalid because it would "strip[ ] the shipper of all the protections afforded it by COGSA." *Id.* at 13. *See also* A. Knauth, *supra* at 184.

So strong is COGSA's policy to preclude clauses lessening the carrier's liability that the same court, overturning its own precedent of the prior decade, held that section 3(8) precluded a clause that required an American plaintiff to assert his claim only in a foreign court. *Indussa Corp. v. S.S. Ranborg*, 377 F.2d 200 (2d Cir.1967) (en banc). Judge Friendly, writing for the court, reasoned that "[s]uch a clause puts a 'high hurdle' in the way of enforcing liability." *Id.* at 203. It was precluded by section 3(8) because "requiring trial abroad *might* lessen the carrier's liability" and that section "can well be read as covering a potential and not simply a demonstrable lessening of liability." *Id.* at 203–04 (emphasis in original). *See also* G. Gilmore & C. Black, *supra* at 145–46 n. 23; *Union Insurance Society of Canton, Ltd. v. S.S. Elikon*, 642 F.2d 721, 724–25 (4th Cir.1981). *Cf. The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 n. 11, 92 S.Ct. 1907, 1913 n. 11, 32 L.Ed.2d 513 (1972) (upholding choice of forum clause but noting specifically that COGSA did not apply).

The commentators agree that section 3(8) of COGSA is the vehicle by which the courts can enforce the basic policy of the Act. *See* A. Knauth, *supra* at 137. According to G. Gilmore & C. Black, *supra* at 189 n. 156,

§ 3(8) is in a sense the key to the Act, for it assures that the cargo interest will receive the broad benefits granted to it without gradual erosion by carefully contrived clauses in the bills of lading drawn up by carriers in concert. The only way it can fulfil this function is by being construed to mean what it says, without too great attention to arguments based on a "convenience" which usually turns out to be carrier's convenience.

As the Fifth Circuit has stated, albeit in a case raising a different issue,

Perhaps the major impetus to COGSA's enactment was the seemingly insufferable condition imposed upon shippers (and, in turn, upon their insurers) by clauses in bills of lading limiting the carrier's liability to very low amounts. These clauses were thought to be the natural result of the carriers' superior bargaining position vis-a-vis shippers.

*Spartus Corp. v. S/S Yafo*, 590 F.2d 1310, 1316 (5th Cir.1979). The Act was designed "to achieve a fair balancing of the interests of the carrier, on the one hand, and the shipper, on the other." *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d at 11. If clauses which relieve the carrier from liability for loss or damage to goods arising from negligence, fault or failure in fulfilling obligations specified in COGSA cannot be enforced, it follows that clauses, whether originating in trade custom or otherwise, cannot be implied if they would have the same effect.

While some customs may be implied into the bill of lading, *see e.g., M. Golodetz Export Corp. v. S/S Lake Anja*, 751 F.2d 1103, 1109–10 (2d Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985) (applying "custom" that carrier of tallow is responsible for keeping it at proper temperature), and COGSA itself directs its interpreters to customs of the trade for some purposes, *see* 46 U.S.C. § 1310 (1982) (weight in bill of lading not prima facie

evidence if third-party weighing is custom of trade); 46 U.S.C. § 1304(5) (valuation of cargo not shipped in packages is to be per "customary freight unit"), this can occur only if the matter is not governed directly by COGSA or is left open by the statutory language. However, no custom can properly be implied into the contract that conflicts with COGSA's provisions or purposes.

■ A custom that lessens or might lessen the carrier's liability under COGSA patently cannot be implied. For example, in *The Portuguese Prince*, 209 Fed. 995 (S.D. N.Y.1913), Judge Hough, who was later to be instrumental in the process leading to the Hague Rules, held that a customary clause in the bill of lading specifying the carrier's authorization to make a substituted delivery did not violate the Harter Act's analog to section 3(8) because a reasonable substituted delivery was not inconsistent therewith. Presumably if it had been, the clause, explicit or implied, would not have been enforced. Although the carrier argues that there is no difference between the custom of using the 60° F. temperature as a measurement norm, see note 3 *supra*, and the 0.5% trade allowance, in the former instance COGSA is silent and the custom implicates no policy underlying the statute whereas in the latter instance the custom may conflict with explicit COGSA provisions and the Act's underlying policies.

■ It remains, therefore, only to consider whether enforcement of the customary trade allowance of 0.5% does present such a conflict. We believe that it manifestly does. The carrier's principal argument is that it is "grossly unreasonable or absurd" to require 100% correspondence between the quantity loaded and that delivered, because of "the inherent qualities of crude oil" and the lack of technology to measure the quantities of oil with precision. Brief of Appellee at 4–5. COGSA takes into account the apparently undisputed fact that for some types of cargo it will not be possible for the carrier to deliver all of the cargo it received for carriage. COGSA provides that in such circumstances the carrier can be relieved of its obligation, but only after the carrier has borne the burden of showing that the shortage in that instance resulted from an "inherent vice."

In one of the numerous arbitrations on this issue discussed in Thomajan, *supra* at 233, it was the opinion of the majority of the panel "that certain losses do, in fact, occur during the transit and discharging which are inherent to the nature of the cargo, the mode of transportation and also attributable to the manner in which quantities are measured, which cannot and should not be held against the Owners," but it concluded nonetheless that an allowance of 0.5% was arbitrary. As the testimony in this case demonstrates, the "inherent vice" of most oil on most voyages, which encompasses both actual loss and measurement imprecision, is considerably less than 0.5%. Thus, enforcing a 0.5% trade allowance both undermines the "inherent vice" provision and shifts the burden of proof to the shipper, thereby limiting the carrier's liability beyond that recognized by COGSA. The same rationale compels rejection of defendant's argument, accepted by the district court judges, that the term "deliver" in the contract of carriage can be interpreted by trade custom to encompass only 99.5% of the cargo loaded. 1983 A.M.C. at 719–20.

Furthermore, the district court's suggestion that the parties should negotiate an agreement if they wish to change or eliminate the trade allowance is unrealistic, because if the courts enforce the 0.5% allowance there will be no incentive for the carriers to negotiate a lower figure for claims settlement purposes even in the face of markedly improved technology to measure and discharge oil. Judicial enforcement of the 0.5% allowance contravenes COGSA's policy as expressed in section 3(8) since it would perpetuate the carrier's superior bargaining power despite legislative history clearly demonstrating that that section was designed to prevent the carrier's use of such power to limit its liability. While customs may permissibly fill the interstices in COGSA's provisions specifying

rights and obligations between shippers and carriers, the customary trade allowance that permits carriers to deliver only 99.5% of the cargo without making the showing required by COGSA is plainly inconsistent therewith. The parties remain free to settle cargo losses in a manner of their own choosing. However, we hold that COGSA precludes giving the carrier a legally enforceable right to a customary trade allowance in a contract governed by COGSA. *Accord, Esso Nederland v. M.T. Trade Fortitude*, 1977 A.M.C. at 2148 ("the fact that an allowance may be used in settlements of cargo disputes does not entail that it should be treated as a rule of law").

The dissent argues that COGSA has nothing to do with the 0.5% trade allowance because it is not a "loss" allowance but is instead an "allowance for imprecision of measurement." With deference to the dissent, we disagree, relying on what the district court judges themselves said and what the evidence showed. The district court judges characterized the allowance as a "customary transit *loss* allowance." 1983 A.M.C. at 719 (emphasis added). They explained that the allowance arose from the factors of "inexact measurement *and* inevitable loss associated with the transportation of liquid cargoes," *id.* (emphasis added); described the allowance "as a reasonable response to the inherent difficulties in measurement *and* carriage of bulk oil cargoes," *id.* at 720 (emphasis added); and consistently referred not only to measurement imprecision but also to the "inevitable" loss of bulk oil cargo, *id.* at 721. The judges summarized the evidence and testimony as establishing "that the difficulty of measuring a cargo such as oil, together with the inevitable loss of some portion of cargo with the inherent properties of oil," led to the trade allowance at issue. *Id.* at 724. Thus, it appears that the judges ascribed the allowance to both factors, as did the carrier's expert witnesses. *See,*

*e.g.*, App. at 607, 687, 782. In fact, even the carrier does not argue that the loss is only due to measurement imprecision; on the contrary, it affirmatively argued that actual loss of oil is part of the rationale for the trade allowance. *See, e.g.*, Transcript of Oral Argument at 20–22.

Nor can we agree with the dissent that the district court judges held that measurements are "likely to be accurate only to within plus or minus 0.5%". Neither the opinion of the three district court judges nor that of the district court in this case so stated. Indeed there was no testimony at all, even by the carrier's expert witnesses, that the measurements were accurate only to within 0.5%. Carrier's witnesses testified only that there was a custom of 0.5% and expressed uncertainty as to whether it was reasonable for a ship's discharge ullage to be only 99.5% of its loading ullage. App. at 696–709, 824, 1228–30. Sun's witnesses testified affirmatively that average measurement inaccuracies were far less than 0.5%. *See, e.g.*, App. at 359–66, 913–20, 1030–34.

■ Since the dissent has conceded that the trade allowance "would run afoul of COGSA's procedural and substantive provisions" were it to be a "loss" allowance, and the district court and the evidence confirm that it is at least in part a "loss" allowance, it follows even under the dissent's logic that we must hold the trade allowance unenforceable.[13]

## V.

### Conclusion

Accordingly, we will reverse the summary judgment entered by the district court in favor of the defendant and will remand for further proceedings. On remand, Tradax Gestion will have the opportunity, and the burden, to show that all or part of the loss

---

**13.** Even if the dissent were correct in characterizing the trade allowance solely as a mismeasurement allowance, we see no reason why measurement imprecision could not be encom-

passed within the inherent vice provision of COGSA, 46 U.S.C. § 1304(2)(m). It would, therefore, still be inconsistent with COGSA for the reasons set forth above.

falls within a provision of COGSA that limits its liability.[14]

JAMES HUNTER, III, Circuit Judge, dissenting:

Despite my admiration for the majority opinion's excellent and thoughtful discussion of the history and policies of COGSA, I am compelled to dissent because I believe that COGSA has nothing to do with the 0.5% trade allowance at issue in this case.

The majority characterizes the trade allowance as exonerating carriers from liability carriers for "unexplained losses" of less than 0.5% of cargoes of crude oil, unless the shipper is able to show that the "loss was due to some specific, known cause...." I do not doubt that the majority is correct in concluding that implying such an allowance into charter parties as a custom of the industry would run afoul of COGSA's procedural and substantive provisions. I do, however, disagree with the majority's characterization of the trade allowance as a "loss" allowance.

As the district court found, the primary purpose of the trade allowance is to recognize that measurement of crude oil in bulk "is better characterized as an art than as an exact science." *Sun Oil Co. v. Mercedes Maria,* 1983 A.M.C. 718, 720 (E.D.Pa. 1982). Because of the rather protean qualities of crude oil, measurement by the customary technique of taking ullages is likely to be accurate only to within plus or minus 0.5%. *Id.* This finding is amply supported by the record. Thus, although the allowance may also take account of "inevitable" problems such as "clingage" of some oil to the insides of tankers, *id.,* it is inaccurate to characterize it as a "loss allowance." It is, rather, an allowance for imprecision of measurement.[1] For this reason, the allow-

ance does not run afoul of COGSA's substantive prohibition against disclaimers of carriers' liability for lost or damaged cargo resulting from negligence or other fault. *See* 46 U.S.C. § 1303(8).

Nor does the allowance offend COGSA's allocations of burdens of proof between shippers and carriers. As the majority opinion correctly notes, a shipper must show short delivery to make out a *prima facie* case for lost cargo against a carrier. *See Quaker Oats Co. v. M/V Torvanger,* 734 F.2d 238, 240 (5th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 959, 83 L.Ed.2d 965 (1985). The burden of proof then shifts to the carrier to show its due diligence, or that the loss was due to one of the causes for which COGSA exempts carriers from liability. *See* 46 U.S.C. § 1304(1). As the district court found, however, measurement of a cargo of crude oil at point of delivery may deviate by as much as 0.5% from the measurement at point of departure, even where no loss has occurred. A shipper of crude oil would not, therefore, be able to show short delivery if the measurement differential was less than 0.5%, unless the shipper could show that there was actual loss due to some specific cause. The trade allowance's requirement that shippers make such a showing does not, as the majority concludes, alter the statutory allocation of burdens of proof by relieving carriers of the burden of proving that they were without fault. It merely recognizes that unless a shipper of crude oil can show a shortfall of more than 0.5% of its cargo, or that a measurement differential of less than 0.5% is due to actual loss from a specific cause, it cannot make out a *prima facie* case against the carrier.

Because I believe that the trade allowance in no way implicates any provision of COGSA, I dissent from the majority opin-

---

**14.** Sun argues that Tradax's stipulation to the fact that Sun's expert would testify as described requires summary judgment in its favor. Tradax, however, has not stipulated to the truth of what the expert will say and must have the opportunity to litigate its COGSA defenses.

**1.** The majority correctly characterizes the district court judges as attributing the 0.5% allow-

ance to both problems of measurement and "inevitable loss." We disagree, however, that this "loss" is the kind of fault-based loss addressed by COGSA. On the contrary, "inevitable loss," like problems of measurement, follows from the inherent characteristics of the oil and the nature of the carriage.

ion's holding that the allowance is unlawful. The only other issue in this case—whether the allowance is a custom of the industry implied into charter parties for crude oil—depends upon findings of fact by the district court which, I believe, are not clearly erroneous. I would, therefore, affirm the judgment of the district court.