The **ATTORNEY GENERAL OF CANADA,** Plaintiff,

v.

**RJ REYNOLDS TOBACCO HOLDINGS, INC., RJ Reynolds Tobacco Company, RJ Reynolds Tobacco International, Inc., RJR–Macdonald, Inc., RJ Reynolds Tobacco Company Pr, Northern Brands International, Inc., and Canadian Tobacco Manufacturers Council, Defendants.**

No. 99–CV–2194.

United States District Court,
N.D. New York.

June 30, 2000.

**136**

Hiscock, Barclay Law Firm, Syracuse, NY, Robert A. Barrer, of counsel, Bartlit, Beck Law Firm, Denver, CO, Fred H. Bartlit, Jr., Karma M. Giulianelli, of counsel, Bartlit, Beck Law Firm, Chicago, IL, Jason L. Peltz, of counsel, Notre Dame Law Firm, Notre Dame, IN, G. Robert Blakey, of counsel, for plaintiff.

Jones, Day, Reavis Firm, Washington, DC, Michael Peter Gurdak, Timothy John Finn, of counsel, for defendants RJ Reynolds Tobacco Holdings, Inc. and RJ Reynolds Tobacco Co.

Scolaro, Shulman, Cohen, Lawler & Burstein, P.C., Syracuse, NY, Alan S. Burstein, of counsel, for defendants RJ Reynolds Tobacco Holdings, Inc., and RJ Reynolds Tobacco Co.

Sullivan & Heard Law Firm, New York City, C. Stephen Heard, for defendants RJ Reynolds Tobacco International, Inc., RJR–MacDonald, Inc., RJ Reynolds Tobacco Company PR, and Northern Brands International, Inc.

King & Spalding Law Firm, Washington, DC, William C. Hendricks, III, of counsel, for defendant Canadian Tobacco Manufacturers Council.

King & Spalding Law Firm, New York City, Patricia A. Griffin, for defendant Canadian Tobacco Manufacturers Council.

King & Spalding, Atlanta, GA, Richard A. Schneider, of counsel, for defendant Canadian Tobacco Manufacturers Council.

### MEMORANDUM—DECISION & ORDER

McAVOY, District Judge.

The Attorney General of Canada ("Canada") commenced the instant action against Defendants alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et. seq.* arising out of an alleged smuggling scheme designed to avoid the payment of Canadian taxes. Presently before the Court are separate motions by all of the Defendants to dismiss the action pursuant to FED. R. CIV. P. 12.

## I. BACKGROUND

Because this matter is before the Court on Defendants' motions to dismiss pursuant to FED. R. CIV. P. 12, the following facts elicited from the Complaint are assumed to be true. *See Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 2895, 125 L.Ed.2d 612 (1993).

### A. The Parties

Plaintiff is the Attorney General of Canada, who brought the instant action on behalf of the nation of Canada.

At all times relevant hereto, Defendants R.J. Reynolds Tobacco Holdings, Inc. ("RJR–Holdings") (a Delaware corporation with its principal place of business in New York) and R.J. Reynolds Tobacco Company ("RJR–US") (a New Jersey corporation with its principal place of business in North Carolina), were the corporate parents of the other four Defendant corporations herein: RJR–Macdonald, Inc. ("RJR–Macdonald") (a Canadian corporation), R.J. Reynolds Tobacco Company PR ("RJR–PR") (a Delaware corporation with its principal place of business in Puerto Rico), R.J. Reynolds International, Inc. ("RJR–Int.") (a Delaware corporation with its principal place of business in Switzerland), and Northern Brands International, Inc. ("NBI") (a Delaware corporation with its principal place of business in North Carolina), which four companies will collectively be referred to as the "RJR Subsidiaries." Defendant Canadian Tobacco Manufacturers Council ("CTMC") is a Canadian corporation that acts as a trade association for the three major tobacco

manufacturers in Canada: Imperial Tobacco Limited; Rothmans, Benson & Hedges, Inc.; and RJR–Macdonald.

## B. The Canadian Taxation Scheme

In the 1980s and 1990s, Canada imposed three types of levies, or taxes, on tobacco. The Excise Act imposed taxes at the point of manufacture. The Excise Tax Act imposed taxes on the sale or delivery of tobacco products. Finally, the goods and services tax ("GST") imposed taxes on the sale of tobacco at the wholesale and retail levels. In addition to these national taxes, each of the provincial governments imposed its own duties and taxes on tobacco products in an amount roughly equal to that of the national taxes. *See* Comp., ¶¶ 47–54.

Between 1982 and 1991, Canada increased the taxes on tobacco products by approximately 550 percent. *See id.*, ¶ 55. Some of these tax increases are purported to have been imposed to reduce tobacco consumption. *See id.*, ¶¶ 57, 59. In 1989, before the major tax increases, the average price per carton for cigarettes in Canada was under $26.00 (CDN). By 1991, the price per carton in Canada ranged from $42.00 to $60.00, the actual price depending upon the amount of taxes imposed by the provincial governments. *See id.*, ¶ 61. The Canadian taxes represented approximately $35.00 of the cost per carton, *see id.*, which created a large discrepancy between the price of tobacco in Canada and the United States. *Id.*, ¶ 60.

Tobacco manufactured in Canada and moved "in bond," or in transit, was exempt from taxation provided that it was not intended for domestic consumption. *See* Comp., ¶ 51.[1] Tobacco manufacturers seeking to move tobacco in bond had to prepare the proper export documentation, which included a representation of the amount of tobacco in each shipment that was to be consumed outside of Canada.

*See* Comp., ¶ 51. Further, tobacco to be exported was required to be marked "Not For Sale in Canada." *Id.*, ¶ 52. Thus, Canadian tobacco exported to the United States could be sold for an approximate average price of $22.00 (CDN) per carton, or approximately one-half the per-carton price in Canada. If tobacco products were imported into designated foreign trade zones ("FTZs") within the United States, United States duties and taxes could also be avoided. *See id.*, ¶ 64. Tobacco goods that are legally imported into Canada are required to be declared. Upon import, the importer of record is obligated to pay any applicable Canadian taxes.

In 1992, in an attempt to reduce the incentive to smuggle exported products back into Canada, Canada imposed an export tax on cigarettes for export or sale through duty-free stores. *See id.*, ¶ 95.

In 1994, in a further effort to combat tobacco smuggling, Canada "rolled back" the excise taxes on tobacco products, reimposed an export tax on Canadian tobacco products, and imposed a three year health promotion surtax on tobacco manufacturing companies' profits. *See id.*, ¶¶ 129–33.

## C. The Alleged Smuggling Schemes

Canada alleges that prior to 1991, RJR Int. established the Special Markets Division in North Carolina ("Special Markets"), which sold tobacco products duty-free to Latin America, South America, the Caribbean, Mexico, and Canada. Canada further alleges that RJR–Macdonald exported Canadian tobacco to Special Markets, which then resold the tobacco products to certain customers. With RJR–Macdonald's and RJR–Int.'s participation, these customers then arranged to have the tobacco smuggled back into Canada for sale on the black market, thereby avoiding

---

**1.** It is interesting to note, as an aside, that there is an extremely small market outside of Canada for Canadian tobacco.

the payment of Canadian taxes. *See id.,* ¶ 69–71.

According to the Complaint, in order to stave off declining profits, in 1991 and 1992, RJR–Macdonald devised a scheme to export Canadian tobacco to customers who would then ship the product to the St. Regis Mohawk Reservation (the "Reservation"). From the Reservation, which straddles the United States–Canadian border, the tobacco was smuggled back into Canada for sale on the black market, free of duties and taxes. *See id.,* ¶¶ 72–94.

The Complaint alleges that RJR–Macdonald representatives met with Larry Miller and Robert and Lewis Tavano, who operated a company called LBL Importing, Inc. ("LBL"). LBL apparently represented that it was in the business of buying Canadian tobacco and selling it to Native Americans, who then smuggled the tobacco back into Canada for sale on the black market. RJR–Macdonald exported the tobacco from Canada (thereby avoiding any Canadian excise taxes) through FTZs in Buffalo, New York to LBL and other customers. LBL and the other customers then shipped the products to the Reservation to be smuggled back into Canada. *See id.*

The Complaint further alleges that, in 1992, after Canada imposed the new export tax, RJR–Macdonald moved two production lines for Canadian cigarettes from its plant in Montreal to RJR–PR (thereby avoiding the export tax). The tobacco manufactured at RJR–PR allegedly was packaged in RJR–Macdonald packaging, sold to Caribbean intermediaries, shipped through FTZs to customers in upstate New York, transferred by the customers at the FTZs to the Reservation, and then smuggled into Canada, thereby avoiding any import and sales taxes. *See id.,* ¶¶ 95–105.

It is alleged that in 1993, Defendants established NBI. Under the alleged NBI scheme, RJR–Macdonald manufactured tobacco in Canada and exported it to FTZs in New York. LBL then placed an order with NBI for the tobacco and wired money for the tobacco from LBL's account in New York to NBI's account in North Carolina. NBI paid a portion of the proceeds from LBL to RJR–Macdonald and another portion of the payment to either RJR–Macdonald, RJR–PR, or RJR–Int. ·After receiving payment, RJR–Macdonald notified the FTZs to transfer title to the customer (such as LBL); the customer then shipped the product to the Reservation; the tobacco was then shipped to the Canadian black market; and the resulting Canadian currency was then used to purchase United States checks and money orders to buy more cigarettes. *See id.,* ¶¶ 110–28.

### D. Criminal Proceedings

In 1997, a grand jury indicted twenty-one individuals on various counts alleging that those criminal defendants smuggled tobacco and liquor products from the United States to Canada through the Reservation. *See United States v. Miller,* 26 F.Supp.2d 415, 419 (N.D.N.Y.1998). Similar to the Complaint herein, the indictment alleged that the smuggling scheme was designed to avoid the payment of duties and taxes levied by Canada upon the importation of tobacco products. *See id.* Many of the indicted individuals, including Miller and the Tavanos, pled guilty to violating 18 U.S.C. § 1956(h) (conspiracy to launder monetary instruments or to engage in monetary transactions in property derived from specified unlawful activity).

NBI pled guilty to aiding and abetting others who violated 18 U.S.C. § 542 (Entry of goods by means of false statements).

In 1999, Leslie Thompson, an executive of NBI, was indicted and ultimately pled guilty to violating 18 U.S.C. § 1956(h).

### E. The Complaint

On December 21, 1999, Canada filed the instant lawsuit. The Complaint asserts four causes of action pursuant to RICO's civil action provision, 18 U.S.C. § 1964(c), alleging violations of 18 U.S.C. §§ 1962(c)-

(d) (the First through Fourth Causes of Action), and asserting a common law fraud claim (the Fifth Cause of Action). As required by this District's local rules, Canada also filed a Civil RICO statement. *See* N.D.N.Y.L.R. § 9.2 (1999).

## II. DISCUSSION

### A. The Pending Motions

Presently before the Court are motions by all Defendants seeking to dismiss the Complaint. The RJR Defendants (that is, all Defendants except CTMC), move to dismiss on the grounds that Canada's action is barred by the Revenue Rule and that the Complaint fails to state a claim under RICO. Defendants RJR–Holdings and RJR–US further move to dismiss under the Acts of State and Political Question doctrines. Defendants RJR–Int., RJR–Macdonald, RJR–PR, and NBI also move to dismiss this action because it is barred by the applicable statute of limitations. All the RJR Defendants have adopted and incorporated one another's motions to dismiss. The RJR Defendants also assert that, if the Court dismisses the RICO claim, it should decline to exercise supplemental jurisdiction over the common law fraud claim.

CTMC separately moves to dismiss on the grounds of lack of personal jurisdiction and *forum non conveniens.*

### B. Standard of Review of RJR Defendants' Motions to Dismiss

In reviewing motions brought pursuant to FED. R. CIV. P. 12(b)(6), the Court must accept all allegations in the Complaint and draw all reasonable inferences in favor of the nonmoving party. *See Burnette v. Carothers,* 192 F.3d 52, 56 (2d Cir.1999). The Complaint may be dismissed only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* (quoting *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

With this standard in mind, the Court will now address the various arguments raised by Defendants.

### C. The Revenue Rule

The RJR Defendants argue that Canada should not be entitled to maintain the instant action because it is, in essence, an attempt by Canada to recoup unpaid taxes and enforce its revenue laws (and obtain treble damages along the way), which is barred by the Revenue Rule. Canada responds that the Revenue Rule is inapplicable because it is not seeking to enforce its tax statutes, but, rather, is attempting to recover damages (some of which include lost tax revenues) as a result of violations of United States law (namely, RICO). Canada argues that "Canadian revenue law becomes relevant only as a matter of *fact* in calculating one component of Canada's damages, not as a matter of *law* in determining whether Defendants are liable." Dkt. No. 77, at p. 6 (emphasis in original).

The common law Revenue Rule provides that United States "courts will normally not enforce foreign tax judgments, the rationale for which is that issues of foreign relations are assigned to, and better handled by, the legislative and executive branches of the government." *United States v. Trapilo,* 130 F.3d 547, 550 (2d Cir.1997), *cert. denied,* 525 U.S. 812, 119 S.Ct. 45, 142 L.Ed.2d 35 (1998); *see also United States v. Boots,* 80 F.3d 580, 587 (1st Cir.), *cert. denied,* 519 U.S. 905, 117 S.Ct. 263, 136 L.Ed.2d 188 (1996); *Her Majesty the Queen in Right Of the Province of British Columbia v. Gilbertson,* 597 F.2d 1161, 1164 (9th Cir.1979) (quoting Lord Mansfield's proclamation in *Holman v. Johnson,* 98 Eng. Rep. 1120, 1121 (1775) that "no country ever takes notice of the revenue laws of another"). As Judge Learned Hand stated more than seventy years ago:

To pass upon the provisions for the public order of another state is, or at any

rate should be, beyond the powers of a court; it involves the relations between the states themselves, with which courts are incompetent to deal, and which are intrusted to other authorities.... Revenue laws fall within the same reasoning; they affect a state in matters as vital to its existence as its criminal laws. No court ought to undertake an inquiry which it cannot prosecute without determining whether those laws are consonant with its own notions of what is proper.

*Moore v. Mitchell,* 30 F.2d 600, 604 (2d Cir.1929) (L. Hand, J., concurring), *aff'd,* 281 U.S. 18, 50 S.Ct. 175, 74 L.Ed. 673 (1930) (declining to express an opinion whether a federal court in one state would enforce the revenue laws of another state); *see also United States v. First Nat'l City Bank,* 379 U.S. 378, 85 S.Ct. 528, 538, 13 L.Ed.2d 365 (1965) (dissenting opinion) ("Foreign courts in customary international practice ... do not enforce foreign tax judgments."); *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 932, 950, 11 L.Ed.2d 804 (1964) (noting that federal and state cases have relied on the principle that a court need not give effect to the penal or revenue laws of foreign countries or sister states); *Milwaukee County v. M.E. White Co.,* 296 U.S. 268, 56 S.Ct. 229, 233, 80 L.Ed. 220 (1935) (assuming that courts of one state are not required to entertain a suit to recover taxes levied under the statutes of another, but holding that the courts of one state must give full faith and credit to *judgments* for such taxes in another state). While the Revenue Rule has not often been litigated in the federal courts, courts have, for example, refused to enforce foreign tax judgments in United States courts. *See Gilbertson,* 597 F.2d 1161. Moreover, while the origins of the Revenue Rule and its continued applicability are subject to serious question (at least with respect to the enforcement of foreign tax *judgments* as opposed to unadjudicated tax claims),[2] the rule appears to be the law of this Circuit. *See U.S. v. First Nat. City Bank,* 321 F.2d 14, 23–24 (2d Cir.1963), *rev'd on other grounds,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965); *Moore,* 30 F.2d at 602; *see also Trapilo,* 130 F.3d at 552–53.[3]

In *First Nat. City Bank,* the Second Circuit clearly recognized the Revenue Rule when it stated that "[i]t has long been a general rule that one sovereignty may not maintain an action in the courts of another state for the collection of a tax claim." 321 F.2d at 23–24. The *Moore* Court held such a rule applicable to tax claims among states (although the Supreme Court later held that states must give full faith and credit to tax judgments of other states). *See Moore,* 30 F.2d 600.

Arguably, the *Trapilo* Court neither expressly recognized nor disavowed the Revenue Rule. *See* 130 F.3d at 550. Based upon the *Trapilo* Court's holding that a prosecution for a violation of 18 U.S.C. § 1343 would not implicate the Revenue Rule because such a prosecution would not necessitate the construction of Canadian

**2.** *See, e.g., Trapilo,* 130 F.3d at 550, n. 4 (quoting Restatement (Third) of the Foreign Relations Law of the United States § 483) ("In an age when virtually all states impose and collect taxes and when instantaneous transfer of assets can be easily arranged, the rationale for not recognizing or enforcing tax judgments is largely obsolete."); *Banco Frances e Brasileiro v. Doe,* 36 N.Y.2d 592, 370 N.Y.S.2d 534, 538, 331 N.E.2d 502 (1975), *cert. denied,* 423 U.S. 867, 96 S.Ct. 129, 46 L.Ed.2d 96 (1975) ("Nor is the [revenue] rule analytically justified. Indeed, much doubt has been expressed that the reasons advanced for the rule, if ever valid, remain so. But inroads have been made.... Some do consider that, in light of the economic interdependence of all nations, the courts should be receptive even to extranational tax and revenue claims").

**3.** Were the Court writing on a clean slate (which, as will be discussed, it is not), it would be inclined to find the Revenue Rule to be outdated (to the extent it was ever properly recognized by courts in the United States in the first instance) and the rationales for the rule to be largely unpersuasive, at least with respect to the recognition of foreign tax judgments.

revenue law, it was not required to reach the issue currently before this Court. However, it could be argued that the *Trapilo* Court recognized the existence and potential applicability of the Revenue Rule in a proper case when, in determining that a prosecution for wire fraud did not impinge upon the Revenue Rule, it stated that "[t]he intent to defraud does not hinge on whether or not the appellees were successful in violating Canadian revenue law .... Consequently, there is no obligation to pass on the validity of Canadian revenue law, and the common law revenue rule is not properly implicated." 130 F.3d at 552–53. That the Revenue Rule is recognized in this Circuit is supported by the *Trapilo* Court's further statement that "[t]he simple fact that the scheme to defraud involves a foreign sovereign's revenue laws does not draw our inquiry into forbidden waters reserved exclusively to the legislative and executive branches of our government." *Id.*, at 553. Reading these three cases together, the Court finds the Revenue Rule to be recognized in this Circuit.

The United States—Canadian Income Tax Convention Treaty of 1980 (the "Treaty") does not alter this result. That Treaty permits states to assist Canada in the collection of certain specified taxes (and vice versa). *See* Dkt. 79, Ex. 17, p. 2351, Art. XXVI A(1). The technical explanation to paragraph 1 explicitly notes that "[t]his provision overrides the traditional rule that a court *judgment* based on a tax debt is not enforceable in a foreign jurisdiction." *Id.* (emphasis supplied). Importantly, just as the technical explanation speaks to abrogation of the Revenue Rule with respect to *judgments* (as opposed to unadjudicated revenue claims), the Treaty itself speaks only to providing assistance with respect to "finally determined" revenue claims. *See id.* at Art. XXVI A(2). The technical explanation defines "[a] revenue claim [as] finally determined when the applicant State has the right under its internal law to collect the revenue claim and all administrative and judicial rights of the taxpayer to restrain collection in the applicant State have lapsed or been exhausted." *See id.* Thus, the Treaty speaks only to judgments or their equivalent; not to efforts by Canada to enforce its revenue laws in the first instance in courts in the United States. *See id.* at Art. XXVI A(3),(5). The Treaty further provides that courts in the United States may not engage in "judicial review of ... [Canada's] finally determined revenue claim ... based on any such rights that may be available under the laws of either Contracting State." *See id.* at Art. XXVI A(5) (emphasis supplied). Thus, while the Treaty may abrogate the Revenue Rule insofar as the two countries may recognize one another's final judgments (or their equivalents), it does not go so far as to eliminate the Rule with respect to unadjudicated or otherwise non-final revenue claims. *See, e.g., Gilbertson,* 597 F.2d at 1165.

Recognizing the existence of the Revenue Rule, however, only begs the impending question—whether the instant civil RICO claim commenced by Canada is precluded by that rule.

To analyze this issue, we must first look to the nature of a civil RICO claim. Such claims are authorized pursuant to 18 U.S.C. § 1964(c), which provides, in pertinent part, as follows:

Any person injured in his business or property by reason of a violation of [18 U.S.C.] section 1962 ... may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

Section 1962, in turn, speaks to activities involving racketeering. *See* 18 U.S.C. § 1962. Racketeering activity is defined in 18 U.S.C. § 1961(a) and includes mail and wire fraud.

Thus, to state a claim under § 1964(c), a plaintiff must plead: " '(1) conduct; (2) of an enterprise; (3) through a pattern (4) of racketeering activity.' " *Anatian v. Coutts*

*Bank, (Switzerland) Ltd.,* 193 F.3d 85, 88 (2d Cir.1999) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985), *cert. denied,* —— U.S. ——, 120 S.Ct. 1241, 146 L.Ed.2d 100 (2000)). "In addition, the plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation." *Sedima,* 105 S.Ct. at 3285; *see also* 18 U.S.C. § 1964(c) ("Any person injured in his business or property... may sue therefor."); *Anatian,* 193 F.3d at 88; *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1347 (2d Cir.1994); *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 767 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 24 (2d Cir.1990) ("Because a conspiracy—an agreement to commit predicate acts—cannot by itself cause any injury, we think that Congress presupposed injury-causing overt acts as the basis of civil standing to recover for RICO conspiracy violations").

Here, the alleged racketeering activity includes violations of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 respectively. *Trapilo* makes it clear that a criminal prosecution for a violation of either of these statutes does not implicate the Revenue Rule. *See* 130 F.3d 547. This is because proof of a violation of either of these statutes requires "(1) the forming of the scheme to defraud, however and in whatever form it may take, and (2) use of [mail and wire communications] in its furtherance. If that is satisfied, more is not required." *Id.* at 551 (quoting *Gregory v. United States,* 253 F.2d 104, 109 (5th Cir. 1958)). In other words, "[t]he statute reaches any scheme to defraud involving money or property, whether the scheme seeks to undermine a sovereign's right to impose taxes, or involves foreign victims and governments." *Id.* at 552. Pursuant to this reasoning:

At the heart of [an] indictment [for mail or wire fraud] is the misuse of the [mail or] wires in furtherance of a scheme to defraud the Canadian government of tax revenue, not the validity of a foreign sovereign's revenue laws. The statute condemns the intent to defraud, that is, the forming of the scheme to defraud, however and in whatever form it may take. The intent to defraud does not hinge on whether or not the appellees were successful in violating Canadian revenue law, as section[s] 1341 [and 1343] [punish] the *scheme,* not its success. Consequently, there is no obligation to pass on the validity of Canadian revenue law, and the common law revenue rule is not properly implicated.

*Id.* at 552–53 (emphasis in original, internal quotations, alterations, and citations omitted). Thus, the mere fact that Canada claims the racketeering activity to have included mail and wire fraud, the object of which was to avoid the payment of Canadian taxes, does not implicate the Revenue Rule. *See id.* at 553.

The problem arises when we look back to the standing and recovery requirements of a claim under 18 U.S.C. § 1964(c) and, in particular, the requirement that a civil RICO plaintiff allege injury to business or property. *See Sedima,* 105 S.Ct. at 3285. This injury requirement imposes an element not present in the indictment that was the subject of *Trapilo. See United States v. Sasso,* 215 F.3d 283, 292 (2d Cir.2000) ("[Section] 1964(c), which permits a civil RICO suit for treble damages by '[a]ny person injured in his business or property' due to a criminal RICO violation, plainly requires a showing of injury."). The government in *Trapilo* was not required to prove any injury to Canada in order to prove a violation of 18 U.S.C. §§ 1341 or 1343. *See Trapilo,* 130 F.3d at 551 (stating that only the *intent* to defraud is necessary and that success of the scheme is irrelevant).

Here, by contrast, to state a civil RICO claim, Canada must prove more than the

mere intent to defraud another of property or the mere establishment of a scheme to defraud utilizing the mails or wire communications in furtherance of that scheme. Again, to have standing and to recover, Canada must allege injury in fact, which ultimately obligates it to prove that some act or acts in furtherance of the scheme caused it to sustain injury. *See* 18 U.S.C. § 1964(c); *Sedima*, 105 S.Ct. at 3285. This distinction is critical to the outcome of this action.

Canada's Complaint asserts two types of injury: (1) lost tax revenues; and (2) increased law enforcement costs expended to combat the smuggling operations. In its civil RICO statement, Canada lists the following injuries:

(1) Increased tobacco consumption among its population, especially its youth.

(2) Continued tobacco consumption among existing smokers.

(3) Monies spent seeking to stop the smuggling and catch the wrongdoers.

(4) Lost revenue from the evasion of tobacco duties and taxes.

(5) Lost revenue because Defendants' conduct compelled the rollback of taxes and duties.

*See* Civil RICO stmnt. Dkt. No. 11, pp. 57, 159–60. Certain of the types of injuries alleged by Canada, namely lost revenues resulting from the evasion of duties and taxes, require it to show that the scheme utilizing the mails and wire communications to defraud it out of tax revenue was successful (at least, in part, insofar as it actually evaded Canadian tax laws thereby causing Canada to lose revenue). This is an important distinction between the instant case and *Trapilo*—if the scheme was unsuccessful, Canada would not have lost tax revenue and would not have suffered injury in fact. Thus, to pur-

sue its claim for damages relating to lost tax revenue, Canada will have to prove, and the Court will have to pass on, the validity of the Canadian revenue laws and their applicability hereto and the Court would be, in essence, enforcing Canadian revenue laws.[4] Enforcing foreign revenue laws is precisely the type of meddling in foreign affairs the Revenue Rule forbids. *See Trapilo*, 130 F.3d at 553; *see also Sabbatino*, 84 S.Ct. at 932–33, 950–951; *Boots*, 80 F.3d 580.

To reiterate Judge Learned Hand's statement in *Moore*, "[t]o pass upon the provisions for the public order of another state [or sovereign nation] is, or at any rate should be, beyond the powers of a court; it involves the relations between the [nations] themselves, with which courts are incompetent to deal, and which are intrusted to other authorities." 30 F.2d at 604. The fact that the executive branch of the United States Government has seen fit to enter into treaties with Canada with respect to the recognition and enforcement of certain tax liabilities, to delineate the extent to which one country's revenue claims may be enforced in the other, and to limit such enforcement to "finally determined" revenue claims, strongly suggests that Canada's RICO claim would draw this Court's "inquiry into forbidden waters reserved exclusively to the legislative and executive branches of our government." *Trapilo*, 130 F.3d at 553. As long as the Revenue Rule prevails (as evidenced by Second Circuit precedent and the Treaty), this Court is precluded from affording the Canadian government an alternative mechanism not expressly authorized by the legislative and/or executive branches of government—those branches particularly responsible for establishing and conducting international relations—by which it may recoup lost tax

4. Defendants do not challenge, *per se*, the actual "validity" of the Canadian revenue laws. In the context of the Revenue Rule, however, "[t]he revenue laws of one state have no force in another.... [and] the tax laws of one state cannot be given extraterritorial effect, so as to make collections through the agency of the courts of another state." *Moore*, 30 F.2d at 602.

revenues in the courts of the United States. *See Trapilo*, 130 F.3d at 553; *Moore*, 30 F.2d at 604; *Gilbertson*, 597 F.2d at 1164–65.

■ Thus, to the extent Canada seeks to prove injury to business and property as a result of lost tax revenues and recover therefor, its claims are barred by the Revenue Rule and, therefore, must be dismissed. The remaining claimed injuries—increased smoking and increased law enforcement costs—do not implicate any Canadian revenue laws and are not precluded by the Revenue Rule.[5]

### D. Act of State Doctrine

Defendants next move to dismiss the Complaint claiming that the act of state doctrine prohibits the court from passing judgment on the political acts of Canada. Defendants argue that the prosecution and defense of this matter will involve political acts including: (1) inquiry into the motivations of the Canadian Parliament in passing and/or repealing various tobacco-related taxes, (2) discovery with respect to Canadian officials and law enforcement personnel, and (3) the determination of the credibility of Canadian officials. Canada responds that the act of state doctrine is inapplicable because Canada has willingly subjected itself to the process of this Court and, more importantly, the instant litigation does not involve the validity of an official act of a foreign sovereign.

The act of state doctrine plays an important role in restraining court involvement in the conduct of foreign affairs. *See W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l.*, 493 U.S. 400, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 937, 11 L.Ed.2d 804 (1964). "In every case in which [the Supreme Court has] held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick*, 110 S.Ct. at 704.

■ Because the Court finds the Revenue Rule to preclude Canada from pursuing its RICO claim seeking damages for lost tax revenues, it need not decide whether the act of state doctrine applies to that portion of the Complaint and, in particular, to a determination of the validity of Canadian revenue laws or the motivation behind the passage of such laws. With respect to the other portions of the Complaint, the Court finds the act of state doctrine inapplicable.

Neither the diligence (or lack thereof) with which Canada is purported to have acted in discovering the alleged fraud, the subjective beliefs of various Canadian officials regarding whether they relied upon the export documentation prepared and submitted by RJR–Macdonald, nor the sufficiency of Canadian law enforcement efforts, constitutes an act of state within the meaning of the doctrine.

Even assuming these acts to be acts of state, the issues in this case do not require a determination of the validity, or legality, of such acts. "The major underpinning of the act of state doctrine is the policy of foreclosing court adjudications involving the legality of acts of foreign states on their own soil that might embarrass the Executive Branch of our Government in the conduct ,of our foreign relations." *Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 1863, 48 L.Ed.2d 301 (1976).

Here, the issues involve whether various acts or events transpired; not the legality of those acts. *See Sharon v. Time, Inc.*, 599 F.Supp. 538, 545–46 (S.D.N.Y.1984) (cited with approval by the Supreme Court in *W.S. Kirkpatrick*, 110 S.Ct. at 705).

---

**5.** The ensuing discussion will be analyzed in the absence of the claims based upon the fraudulent avoidance of taxation.

Thus, the focus at trial would be whether the actions undertaken by Canada and its officials would have reasonably alerted them to an ongoing fraud against its revenue statutes and whether Canada reasonably relied on various representations; not a determination of whether any of Canada's actions were validly, or legally, undertaken. *See Sharon,* 599 F.Supp. at 545–46. Stated otherwise, passing judgment upon "the motives for the tax repeal, the sufficiency of the efforts made by Canadian government agencies to investigate cigarette smuggling, and the alleged reliance of the Canadian government on statements made by defendant," *see* RJR–Holdings and RJR–US Mem. in support of Motion to Dismiss, Dkt. No. 64, p. 12, does not require a determination regarding the validity of the acts of a foreign sovereign.

Furthermore, the Court discerns no policy reasons why a factual determination of these issues would hinder the conduct of foreign affairs—the primary reason behind the act of state doctrine. *See W.S. Kirkpatrick,* 110 S.Ct. at 704; *see also Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897); *Bandes v. Harlow & Jones, Inc.,* 852 F.2d 661, 666 (2d Cir.1988). "Moreover, the act of state doctrine reflects respect for foreign states, so that when a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker." *Republic of Philippines v. Marcos,* 806 F.2d 344, 359 (2d Cir.1986), *cert. dismissed,* 480 U.S. 942, 107 S.Ct. 1597, 94 L.Ed.2d 784 (1987).

In addition, the act of state doctrine arguably works against Defendants because, rather than depriving a court of jurisdiction, the doctrine instructs that "the act within its own boundaries of one sovereign State becomes a rule of decision for the courts of this country." *W.S. Kirkpatrick,* 110 S.Ct. at 705 (internal quotations and alterations, and citation omitted); *see also Sharon,* 599 F.Supp. at 547. In other words, the doctrine could work to

compel this Court to presume the validity of the various actions of the Canadian government at issue.

For the foregoing reasons, the Court finds that the act of state doctrine does not form a basis upon which it should refrain from entertaining the present action.

**E. Political Question Doctrine**

Defendants next claim that the political question doctrine renders this case nonjusticiable because the instant litigation involves issues committed to different branches of the United States government (international tax collection), a lack of judicially discoverable and manageable standards (inquiry into the reasons behind the repeal of the various tobacco taxes and the sufficiency of Canadian law enforcement efforts), and potential embarrassment to the legislative and/or executive branches of government (the adjudication of the conduct, knowledge and motives of a range of Canadian government officials). Canada responds that this case involves application of United States law (RICO and common law fraud) and will not force this Court to make foreign policy determinations or otherwise thrust this Court into the foreign policy arena.

"Not every case 'touching foreign relations' is nonjusticiable." *Kadic v. Karadzic,* 70 F.3d 232, 249 (2d Cir.1995) (quoting *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 707, 7 L.Ed.2d 663 (1962)), *cert. denied,* 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996). Thus, courts must consider the relevant factors on a case-by-case basis to determine whether the political question doctrine is implicated. *See id.*

In *Baker,* the Supreme Court enunciated the standards for determining whether an issue is non-justiciable under the political question doctrine:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a

lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

82 S.Ct. at 710; *see also Padavan v. United States,* 82 F.3d 23, 27 (2d Cir.1996). Upon review of these factors, the Court finds the political question doctrine to be inapplicable.

First, the issue involved here, whether Defendants' fraudulent acts injured Canada, is not something that has been constitutionally committed to a coordinate branch of government. To the contrary, the adjudication of RICO and fraud claims is entrusted to the judiciary. *See, e.g., Kadic,* 70 F.3d at 249; *Klinghoffer v. S.N.C. Achille Lauro Ed Altri–Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44, 49 (2d Cir.1991). Second, the Court agrees with Canada that the instant RICO and common law fraud claims do not implicate undiscoverable or unmanageable judicial standards. The legal analysis of these claims rests upon readily ascertainable domestic law and judicial standards. *See Kadic,* 70 F.3d at 249; *Klinghoffer,* 937 F.2d at 49 (tort action against Palestinian Liberation Organization does not implicate political question doctrine). Third, resolution of Canada's remaining claims will not implicate policy determinations of a kind not suitable for judicial resolution. Again, RICO and fraud claims are typically handled by the judiciary. *See Kadic,* 70 F.3d at 249; *Klinghoffer,* 937 F.2d at 49–50. Fourth, nothing this Court does in the course of this litigation should express a lack of respect for the coordinate branches of government. The Court's involvement will be limited to litigating a dispute between Canada and Defendants and will not involve any policy pronouncements or otherwise impinge upon the foreign policy of this nation. *See Klinghoffer,* 937 F.2d at 49–50. Fifth, the Court is unaware of any previously made political decisions the adherence to which would suggest that this Court should decline to move forward with this matter. To the contrary, the criminal prosecutions initiated by the United States Attorney's Office suggest that the political decision made by the executive branch is to prosecute persons who violate RICO and the wire and mail fraud statutes. *See Klinghoffer,* 937 F.2d at 49–50. Sixth, and finally, there have been no multifarious pronouncements by other governmental departments of which this Court is aware that could result in embarrassment if the Court allowed this matter to proceed. In sum, with respect to these last three factors (and having eliminated Canada's tax-based claims), a judicial decision would not contradict prior decisions taken by a coordinate political branch and it is unclear how anything done by this Court will interfere with the important governmental interests of those coordinate branches. *See Kadic,* 70 F.3d at 249. Although foreign policy may be tangentially affected here, "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker,* 82 S.Ct. at 707; *see also Kadic,* 70 F.3d at 249; *Can v. United States,* 14 F.3d 160, 163 (2d Cir.1994); *Klinghoffer,* 937 F.2d at 49. Thus, the political question doctrine does not render Canada's remaining claims non-justiciable.

### F. Whether Canada is a "Person" Under RICO

Defendants next argue that Canada's RICO claims are statutorily barred because a foreign state is not a "person" as that term is defined in 18 U.S.C. § 1961(3). The substance of Defendants' argument is as follows: RICO defines the term "person" identically regardless of whether that

person is the RICO plaintiff or defendant. Thus, someone, or something, that falls within RICO's definition of a "person" may not only bring suit under 18 U.S.C. § 1964(c), but is also exposed to criminal and civil liability thereunder. However, foreign states, such as Canada, enjoy sovereign immunity and cannot be haled into United States courts as defendants. Defendants argue that if foreign states are considered to be "persons" under RICO and, thus, subject to civil and criminal liability, this would amount to an unexpressed abrogation of their sovereign immunity—something Congress did not intend. Carrying the argument to the next step, Defendants maintain that because foreign states cannot be RICO defendants because of sovereign immunity, they fall outside the statutory definition of a "person" and, thus, cannot be RICO plaintiffs. To hold otherwise, the argument goes, the Court would have to find that Congress intended different definitions of the word "person" within the same statute, depending on whether we are looking at the "person" as a plaintiff or defendant. Canada responds that, when RICO is analogized to the antitrust statutes and under the authority of *Pfizer, Inc. v. Government of India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), foreign governments are "persons" within RICO's statutory definition.

■ As with any matter involving statutory construction, the best place to start is with the statute itself. *See U.S. v. Bonanno Organized Crime Fam. of La Cosa Nostra*, 879 F.2d 20, 21 (2d Cir.1989). As a general rule, the term "person" does not include the sovereign. *See United States v. Cooper Corp.*, 312 U.S. 600, 61 S.Ct. 742, 743, 85 L.Ed. 1071; *see also Vermont Agency of Natural Resources v. United States ex. rel. Stevens*, —— U.S. ——, ——, 120 S.Ct. 1858, 1866, 146 L.Ed.2d 836, —— (2000). This, however, is not a "hard and fast rule of exclusion." *Cooper*, 61 S.Ct. at 743. "The purpose, the subject matter, the context, the legislative history, and the

executive interpretation of the statute are aids in construction which may indicate an intent, by the use of the term, to bring state or nation [or foreign states] within the scope of the law." *Cooper*, 61 S.Ct. at 743–44.

Congress provided a specific definition of the word "person" when used in RICO. Section 1961(3) provides that " 'person' includes any individual or entity capable of holding a legal or beneficial interest in property." Canada does not attempt to argue that it is an individual, but, rather, claims that it is an entity capable of holding a legal or beneficial interest in property.

As defined by Black's Law Dictionary, an "entity" includes "state, United States, and foreign government." BLACK'S LAW DICTIONARY 532 (6th ed.1990) (citing REV. MODEL BUS. CORP. ACT § 1.40.). Thus, applying the plain language of the statute and the common understanding of the words employed therein, the definition of a "person" includes foreign states. *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1358 (9th Cir.1988) ("[A] governmental body is a person within the meaning of 18 U.S.C. § 1961(3)... The foreign nature of the [plaintiff] does not deprive it of statutory personhood."), *cert. denied* 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989); *see also Pfizer*, 98 S.Ct. 584 (foreign states are "persons" within the antitrust laws).

Relying on *Bonanno*, Defendants argue that governments are not persons within the meaning of § 1961(3). In *Bonanno*, the United States government sought treble damages under 18 U.S.C. § 1964(c) against the defendants therein. Like Canada does here, the United States claimed that it was an entity capable of holding legal or beneficial title in property and, thus, a "person." The Second Circuit disagreed.

The *Bonanno* Court found that the United States is not a "person" within the meaning of RICO despite its ability to hold legal or beneficial interest in property.

*See Bonanno,* 879 F.2d at 22. The *Bonanno* Court reasoned that when Congress intends to include the United States in a statutory provision, it does so explicitly; not by a catchall word such as "person." *See id.* The *Bonanno* Court stated that:

> If the government's standing under Section 1964(c) is "plain," one would be at a loss for adjectives to describe the manner in which Congress ordinarily expresses its intention to render a statutory provision applicable to the United States; by explicit reference to the United States in the operative language of the statute or by explicit inclusion of the United States in the statutory definition of the object or objects affected by the law.

*Bonanno,* 879 F.2d at 22. As the Second Circuit noted in *Bonanno,* this is evident from the various statutory provisions of RICO itself. *See id.; see, e.g.,* 18 U.S.C. § 1964(b)("The Attorney General may institute proceedings under this section").

The *Bonanno* court relied heavily on *Cooper,* 61 S.Ct. 742, in which the Supreme Court determined that the United States was not a "person" within the meaning of § 4 the Clayton Act, 15 U.S.C. §§ 12, 15. While *Cooper* involved antitrust instead of racketeering violations, the *Bonanno* Court noted that the antitrust laws served "as a model for the structure and language of RICO." *Bonanno,* 879 F.2d at 24. In fact, "the 'clearest current' in the legislative history of RICO is the reliance on the Clayton Act model." *Town of West Hartford v. Operation Rescue,* 915 F.2d 92, 103 (2nd Cir.1990). As the Second Circuit noted, "[if] the standing provisions of the antitrust laws have not precisely been incorporated into RICO, they are, at a minimum, pertinent to the Act and contain, in certain respects, identical language." *Bonanno,* 879 F.2d at 25. Reference to antitrust

cases is, therefore, instructive when interpreting RICO.

However, the reasoning in *Bonanno* and *Cooper,* insofar as it restricts the standing of the United States, does not apply when a foreign sovereign's standing is at issue. Foreign states are not on the same footing as is the United States and Congress does not treat foreign states as it does the United States when drafting statutes. As the Second Circuit stated in *Bonanno,* when Congress refers to the United States in a statute, it does so explicitly. *See Bonanno,* 879 F.2d at 22; *see also Cooper,* 61 S.Ct. at 744 ("[I]f the purpose [of the statute] was to include the United States, 'the ordinary dignities of speech would have led' to its mention by name."). The same cannot be said with respect to foreign states.[6] *See, e.g., Pfizer, Inc.,* 98 S.Ct. at 588–91; *Marcos,* 862 F.2d at 1358; *but see* 16 U.S.C. § 1532(15) (defining "person" to include "any officer, employee, agent, department, or instrumentality of . . . any foreign government.").

Aside from the way in which Congress explicitly refers to the United States and not to foreign states, there is another critical distinction between the United States and foreign states with respect to the RICO and antitrust statutes. Important to the decisions in *Bonanno,* 879 F.2d at 22, 25–25, 27 (referring to RICO), and *Cooper,* S.Ct. at 745 (referring to the antitrust laws), was that the United States allotted itself several "potent weapons for anforcing the Act." *Georgia v. Evans,* 316 U.S. 159, 62 S.Ct. 972, 973, 86 L.Ed. 1346 (1942). Therefore, declining to afford the United States a treble damages remedy was not detrimental to its ability to assert its rights under the two acts.

In contrast, foreign sovereigns lack any remedy other than an action for treble

**6.** Congress amended the Clayton Act to address the situation of foreign states suing under that Act. Importantly, however, Congress did not expressly grant standing to foreign states and, perhaps more importantly, it did not exclude foreign states from the definition of "person." Rather, Congress allowed for actual damages for "any person who is a foreign state." 15 U.S.C. § 15(b)(1). This tends to indicate Congress's approval of the Supreme Court's definition in *Pfizer* of the term "person" to include foreign states.

damages under either the antitrust acts or RICO. In *Pfizer*, a divided Supreme Court made this distinction in the antitrust context, holding that foreign governments could sue for treble damages under the antitrust laws.[7] Distinguishing *Cooper*, the Court emphasized the reasoning used in *Georgia v. Evans*, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346, in which the State of Georgia sought to recover treble damages under the antitrust statutes. The *Evans* Court noted that "[t]he considerations which led to th[e] conclusion [in *Cooper* that the United States is not a 'person'] are entirely lacking here." 62 S.Ct. at 974. Specifically, the *Evans* Court reasoned that excluding states from the definition of "person" in the antitrust acts would deprive them of any remedy for antitrust violations, a conclusion "[n]othing in the Act, its history, or its policy, could justify." 62 S.Ct. at 974. Emphasizing that states had no specific or explicit grants of authority or rights of action under the antitrust laws, the Supreme Court held that "[w]e can perceive no reason for believing that Congress wanted to deprive a State . . . of the civil remedy of treble damages which is available to other[s] . . . who suffer through violation of the Act." *Evans*, 62 S.Ct. at 974. It was on this basis, as well as general notions of international comity, that the *Pfizer* Court determined that foreign sovereigns are "persons" within the meaning of the antitrust laws. *See Pfizer*, 434 U.S. at 318, 98 S.Ct. 584.

■ A similar conclusion is warranted here. As with the antitrust laws, the RICO laws allow the United States several specific remedies including the rights to: (1) commence criminal prosecutions; (2) obtain injunctive relief; (3) seize property, *see* 18 U.S.C. §§ 1963; 1964(b); and (4) commence a civil action. *See* 18 U.S.C. § 1964(b),(d). These rights are not, however, afforded to foreign states. Thus, if foreign states do not fall within the definition of "person" and, accordingly, may not sue under § 1964(c), then they would be deprived of a RICO remedy for any injuries they may have sustained as a result of racketeering activity. There is nothing in the legislative history or elsewhere tending to suggest that Congress intended to exclude foreign states from the civil remedies afforded in § 1964. *See Marcos*, 862 F.2d at 1358.[8]

There is another important distinction between the antitrust laws and RICO that further leads this Court to conclude that Canada is a "person" under RICO. Although the civil enforcement provisions of § 4 of the Clayton Act, 15 U.S.C. § 15, and 18 U.S.C. § 1964(c) are quite similar, the statutory definition of "person" under those statutes differ. The Clayton Act defines the word "person" to "include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the territories, the laws of any State, or the laws of any foreign country." 15 U.S.C. § 12(a). RICO, however, has a much more expansive definition, providing simply that a person includes any entity capable of holding a legal or beneficial interest in property—something Canada is surely able to do. Had Congress intended to exclude foreign states, it could have done so explicitly. *See, e.g.*, 11 U.S.C. § 101(41) (excluding governmental units from the definition of "person").

7. As noted in the preceding footnote, in response to the *Pfizer* decision, Congress amended the Clayton Act to limit foreign states to actual, rather than treble, damages. *See* 15 U.S.C. § 15; *see also* H.R. REP. No. 476, 97th Cong. (1982), *reprinted in* 1982 U.S.C.C.A.N. 3495.

8. The Court is cognizant that the anomaly raised by the *Pfizer* decision will similarly result from this Court's holding. Thus, foreign states will "have a more potent remedy than the United States in seeking monetary damages for violations of the [RICO] laws." *See*. H.R. REP. 393, 1982 U.S.C.C.A.N. at 3500. As with the Clayton Act, however, the resolution of this anomaly lies with Congress; not the courts.

Although the sovereign immunity issues raised by Defendants and by the *Bonanno* Court pose, perhaps, an interesting paradox, the Court need not delve into that issue because it has been resolved in the antitrust context by the Supreme Court in *Pfizer*,[9] the reasoning of which applies equally here. Moreover, the Second Circuit recognized in *Bonanno* that states have been held to be "persons" under RICO notwithstanding their Eleventh Amendment immunity from suit in the federal courts. *See Bonanno,* 879 F.2d at 25 (citing cases); *see also, Illinois Dep't of Revenue v. Phillips,* 771 F.2d 312 (7th Cir.1985) (recognizing state agency, an entity possessing Eleventh Amendment immunity, as a "person" under RICO).

Given the close parallel between RICO and the antitrust laws and the clear holding in *Pfizer* that foreign states may sue thereunder notwithstanding that the United States cannot, *see Pfizer,* 434 U.S. at 318, 98 S.Ct. 584, and for the reasons previously discussed, the Court finds that Canada is a person entitled to seek treble damages under § 1964(3).

### G. Whether Canada has Suffered a Cognizable Injury Under RICO

Defendants next move to dismiss on the ground that the types of injuries claimed by Canada are not cognizable under RICO as injury to business or property. Canada responds that it sustained injury in the form of tax losses, increased law enforcement costs, and increased tobacco consumption as a direct result of Defendants'

alleged scheme to avoid Canadian taxes and laws.

As mentioned *supra* at § II(B)(1) (p. 17), a RICO plaintiff only has standing if it can demonstrate that it sustained injury to "business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c); *see also Sedima,* 105 S.Ct. at 3285. This phrase contains two elements necessary to a RICO plaintiff's claim: (1) injury to business or property; and (2) proximate causation.

■ With respect to proximate cause, the Supreme Court has stated that a RICO plaintiff must demonstrate that it would not have sustained the injury but for defendant's violation of the statute and that such injury was proximately caused by defendant's violation, applying common law notions of proximate causation. *See Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); *see also Laborers Local 17 Health and Benefit Fund v. Philip Morris, Inc.,* 191 F.3d 229, 234 (2d Cir. 1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000) *("Philip Morris"); Moore v. PaineWebber, Inc.,* 189 F.3d 165, 178 (2d Cir.1999) (Calabresi, C.J., concurring).

The difficulties of applying the concept of proximate cause were fully set forth by the Second Circuit in *Philip Morris, See* 191 F.3d at 234–38. That case made clear that, to establish proximate cause, a plaintiff must prove: (1) direct injury, *see id.* at 235 ("direct injury is a key element for establishing proximate causation"); and (2) foreseeability. *See id.* at 236. Other fac-

---

9. *Pfizer* held that foreign states are "persons" that can sue under the antitrust laws, *see* 15 U.S.C. § 15, notwithstanding that the prohibitions of those laws also apply to "persons" (thereby subjecting those who can sue under the antitrust laws to liability thereunder), *see, e.g.,* 15 U.S.C. § 1 ("Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony."); 15 U.S.C. §§ 2, 3, 8 ("Every person...."); 15 U.S.C. § 7 (defining "person"); 15 U.S.C. § 12 (defining "person"); 15 U.S.C. §§ 13,

13a, 14 ("It shall be unlawful for any person...."), and notwithstanding that foreign states ordinarily are not susceptible to suit in our courts. *See Pfizer,* 98 S.Ct. at 586; *cf.,* 98 S.Ct. at 592–93 ("Given that 'person' as used in the Clayton and Sherman Acts refers to both antitrust plaintiffs and defendants, the decision of Congress to include foreign corporations while omitting foreign sovereigns from the definition most likely reflects this differential susceptibility to suit.") (Burger, J. dissenting) (internal citation omitted).

tors may also play into the equation. *See id.* at 235–36.

### 1. Loss of Tax Revenues

Because the Court has dismissed that portion of Canada's claim seeking recovery of lost tax revenues as barred by the Revenue Rule, *see* discussion *supra* at II(B)(1), the Court need not analyze whether these claimed damages constitute injury to business or property or whether Defendants' alleged RICO violations proximately caused these injuries.

### 2. Increased and/or Continued Tobacco Consumption

In its Civil RICO statement, Canada lists "[i]ncreased tobacco consumption among its population, especially its youth" and "[c]ontinued tobacco consumption among existing smokers" as part of the injury to business or property it sustained as a result of Defendants' alleged RICO violations. *See* Dkt. No. 11, pp. 57, 159. However, Canada falls to specify what harm it actually sustained as a result of any increased and/or continued tobacco consumption. It, therefore, is difficult to ascertain whether this claimed harm is injury to business or property. Moreover, even assuming this to be injury to business or property, any harm sustained by Canada as a result of increased and/or continued tobacco consumption is:

> entirely derivative of the harm suffered by [its citizens] as a result of using tobacco products. Without injury to the individual smokers, [Canada] would not have incurred any increased costs [or other such injuries as a result of increased and/or continued tobacco consumption].... Being purely contingent on harm to third parties [the individual smokers], these injuries are indirect. Consequently, because [D]efendants' alleged misconduct did not proximately cause the injuries alleged, [P]laintiff[ ]

lack[s] standing to bring RICO claims against [D]efendants [on this ground]. *Philip Morris,* 191 F.3d at 239.

As in *Philip Morris,* a finding of a lack of proximate cause here with respect to increased and/or continued tobacco consumption fully comports with the policy considerations set forth by the Supreme Court in *Holmes. See* 112 S.Ct. at 1318. In *Holmes,* the Supreme Court recognized the following policy considerations behind requiring direct injury:

> [1] the less direct the injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors[;] ... [2] recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries[;] ... [and][3] directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely.

112 S.Ct. at 1318 (internal citations omitted); *see also Philip Morris,* 191 F.3d at 239–241. For these reasons, any damages sustained by Canada as a result of increased and/or continued tobacco consumption purportedly caused by Defendants' alleged RICO violations are indirect and, thus, were not proximately caused by Defendants' actions. Accordingly, Canada may not recover damages under § 1964(c) for these claimed injuries.

### 3. Increased Law Enforcement Costs

As part of its alleged injuries to business or property, Canada claims that it "[s]pent monies seeking to stop the smuggling and catch the wrongdoers." Dkt. No. 11, p. 159. Defendants move to dismiss this portion of the Complaint contending that increased law enforcement costs constitute non-recoverable sovereign injury (as op-

posed to commercial injury). Canada responds that Defendants' scheme to evade Canadian law directly and proximately caused the increased law enforcement costs and, thus, it may recover such costs.

The initial inquiry with respect to this claimed injury is whether it constitutes injury to "business or property." Under the Clayton Act, which, as previously discussed, served as a model for RICO, to state a claim a plaintiff must demonstrate a competitive injury. *See Bonanno,* 879 F.2d at 24. RICO differs from the Clayton Act, however, in that there is no requirement of competitive injury. *See Sedima,* 105 S.Ct. at 3285; *see also National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (Section 1964(c) does not require proof of an economic motive); *Phillips,* 771 F.2d at 314. As the *Sedima* Court stated:

> Where the plaintiff alleges each element of the violation, the compensable injury necessarily is the harm caused by predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Those acts are, when committed in the circumstances delineated in § 1962(c), "an activity which RICO was designed to deter." Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the commission of the predicate acts.

*Sedima,* 105 S.Ct. at 3285. In footnote 15, the *Sedima* Court explicitly stated that "[s]uch damages include, *but are not limited to,* ... competitive injury." *Sedima,* 105 S.Ct. at 3285 n. 15 (emphasis supplied).

Because Canada was compelled to increase law enforcement expenditures to combat Defendants' alleged smuggling operations, it appears that such expenses are compensable as injury to Canada's property. *See, e.g., Phillips,* 771 F.2d 312 (State Department of Revenue had standing under RICO to recover treble damages against retailer who filed fraudulent tax returns); *Marcos,* 862 F.2d at 1358 (Re-

public of the Philippines properly stated RICO claim for money allegedly fraudulently obtained from it). After all, Defendants' purported activities forced Canada to expend additional money, which, "of course, is a form of property." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979).

If the inquiry ended here, the Court would be inclined to allow Canada's claims for law enforcement costs to proceed. However, the analysis of whether Canada sustained a cognizable injury to business or property under RICO is complicated by the Second Circuit's decision in *Town of West Hartford,* 915 F.2d 92. *Town of West Hartford* involved somewhat similar damages to those sought by Canada herein (law enforcement costs). In that case, anti-abortion activists engaged in a series of acts designed to impede access to and shut down a medical facility that provided abortion services. To restore order to the area and provide for the general safety, the Town of West Hartford responded with approximately forty police officers, ambulance and paramedic teams with which it had contracted to provide services, and the fire department. The Town of West Hartford then commenced a RICO action against the anti-abortion activists seeking to recover for its reduced ability to respond to police and fire emergencies on two separate occasions, the impairment of its contract for paramedic services, having its police force operate in an unnecessary level of alertness, and overtime wage expenses which it would not otherwise have incurred. *See Town of West Hartford,* 915 F.2d 92.

Relying on *Hawaii v. Standard Oil Co. of California,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972) and *Reiter,* 99 S.Ct. 2326, two cases involving the Clayton Act, the Second Circuit held that because these injuries (including the overtime expenses) were not injuries to a municipality as a party to a commercial transaction, they "do not fall within the ambit of section 1964(c)." *Town of West Hartford,* 915

F.2d at 104. Again noting the close similarity between the Clayton Act and RICO, the Second Circuit interpreted *Hawaii* to mean that governmental entities cannot recover for injuries to their general economy or their ability to carry out their functions. *See id.* at 103–04. Thus, pursuant to *Town of West Hartford*, where a municipality sues under RICO, it must allege injury to its business or property in its capacity "as a party to a commercial transaction." *Id.* at 104.

The *Hawaii* case, upon which the Second Circuit heavily relied in *Town of West Hartford*, involved an antitrust action (§ 4 of the Clayton Act) by the State of Hawaii seeking, among other things, damages for alleged monopolistic and price fixing activities in three capacities: (1) in its proprietary capacity for overcharges for petroleum products purchased by the state itself; (2) as *parens patrise* for similar overcharges paid by its citizens; and (3) as class representative for all purchasers in Hawaii for identical overcharges. *See Hawaii*, 92 S.Ct. at 887. The Court did not question the State's ability to recover for losses it directly sustained as a consumer of petroleum products. Instead, the issue before the Court was whether "the injury asserted by Hawaii in its *parens patrise* count is an injury to its 'business or property' [within the meaning of § 4 of the Clayton Act]." *Id.* at 890.

The Supreme Court held that "[l]ike the lower courts that have considered the meaning of the words 'business or property,' we conclude that they refer to commercial interests or enterprises. When the State seeks damages for injuries to its commercial interests, it may sue under § 4. But where... the State seeks damages for other injuries, it is not properly within the Clayton Act." *Id.* 92 S.Ct. at 892.

Central to the Supreme Court's decision in *Hawaii* were some of the practical implications of permitting the State of Hawaii to recover on behalf of its citizens. *See Reiter*, 99 S.Ct. at 2332. The first

concern was that of ascertaining damages. The Court stated that:

> Where the injury to the State occurs in its capacity as a consumer in the marketplace, through a "payment of money wrongfully induced," *Chattanooga Foundry & Pipe Works v. City of Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 66, 51 L.Ed. 241 (1906), damages are established by the amount of the overcharge. Under § 4, courts will not go beyond the fact of this injury to determine whether the victim of the overcharge has partially recouped its loss in some other way, even though a State, for example, may ultimately recoup some part of the overcharge through increased taxes paid by the seller. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481, 88 S.Ct. 2224, 2229, 20 L.Ed.2d 1231 (1968). Measurement of an injury to the general economy, on the other hand, necessarily involves an examination of the impact of a restraint of trade upon every variable that affects the State's economic health—a task extremely difficult, "in the real economic world rather than an economist's hypothetical model." *Id.*, 88 S.Ct. at 2231. The lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.

*Hawaii*, 92 S.Ct. at 891–92 n. 14.

The second concern dealt with the apportionment of damages and potential for duplicative recoveries. *See Reiter*, 99 S.Ct. at 2332 ("A central premise of our holding in *Hawaii* was concern over duplicative recoveries"). Because every individual who suffered damage to business or property by reason of an antitrust violation could seek redress under § 4, allowing the state to recover for these same damages "would open the door to duplicative recoveries." *Hawaii*, 92 S.Ct. at 892. In this regard, the Court stated that:

A large and ultimately indeterminable part of the injury to the "general economy," as it is measured by economists, is no more than a reflection of injuries to the "business or property" of consumers, for which they may recover themselves under § 4. Even the most lengthy and expensive trial could not in the final analysis, cope with the problems of double recovery inherent in allowing damages for harm both to the economic interests of individuals and for the quasi-sovereign interests of the State. At the very least, if the latter type of injury is to be compensable under the antitrust laws, we should insist upon a clear expression of a congressional purpose to make it so, and no such expression is to be found in § 4 of the Clayton Act.

92 S.Ct. at 892. For these reasons, the Supreme Court refused to allow Hawaii to recover under § 4 of the Clayton Act for injuries other than those to its commercial interests.

Several years after the *Hawaii* decision, the Supreme Court decided *Reiter,* in which the Court held that consumers of retail goods, and not just injured business entities, have standing to sue under § 4 of the Clayton Act, thereby broadening the Clayton Act's standing requirement. *See Reiter,* 99 S.Ct. at 2332. Later, the Supreme Court decided *Sedima,* in which, as noted, it adopted a broad reading of RICO's injury requirement. *See Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 105 S.Ct. 3275, 3285–86, 87 L.Ed.2d 346 (1985); *see also Sasso,* 215 F.3d 283, 290 (noting that § 1964(c) should be interpreted broadly). Importantly, in *Sedima,* which involved private litigants, the Supreme Court noted that RICO damages are not limited to those resulting from competitive injury. *See id.; cf Sedima,* 105 S.Ct. at 3289, 3290 (1985) (Marshall, Brennan, Blackmun, and Powell, JJ., dissenting) ("The only way to give effect to Congress' concern is to require that plaintiffs plead and prove that they suffered RICO injury—injury to their competitive, investment, or other business interests").

The Supreme Court's wording in *Hawaii* requiring "damages for injuries to its commercial interests" precluded the types of damages sought in *Town of West Hartford.* However, the reasons for the holding in *Hawaii* seemingly did not apply to the facts in that case. The Town of West Hartford sought to recover, at least in part, for discrete injuries to itself—over $42,000 in overtime wage expenses. Unlike in *Hawaii,* the Town of West Hartford itself actually sustained these injuries, they were readily ascertainable (presumably, one could simply refer to the Town's payroll records), and there was no possibility of duplicative recoveries because no other individuals or entities would be able to recover those damages sustained by the Town.

Notwithstanding these distinctions, the extension of the liberal RICO injury requirement beyond competitive injury, and the difference between the injury requirement in RICO and § 4 of the Clayton Act, *see, e.g., Bieter Co. v. Blomquist,* 987 F.2d 1319, 1327 (8th Cir.), *cert. denied,* 510 U.S. 823, 114 S.Ct. 81, 126 L.Ed.2d 50 (1993); *Bennett v. Berg,* 685 F.2d 1053, 1059 (8th Cir.1982), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.,* 792 F.2d 341, 354 (3d Cir.1986), *aff'd,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987); *Phillips,* 771 F.2d at 316, the Second Circuit held that the injuries sustained by the Town of West Hartford constituted non-cognizable injury to the Town's general economic well-being and/or its ability to carry out its functions. *See Town of West Hartford,* 915 F.2d at 104. In short, *Town of West Hartford* requires injury to the government's commercial interests in RICO claims. The Court has been unable to find any Supreme Court or Second Circuit cases that have overruled, abrogated, or otherwise departed from this holding to which this Court is bound.

Here, like in *Town of West Hart-ford*, Canada is seeking to recover increased law enforcement costs. The Court agrees with Canada that these costs could readily be found to be a direct and proximate cause of Defendants' alleged unlawful activity, thereby satisfying the causation requirement. Moreover, Canada has sustained distinct economic harm allegedly as a result of Defendants' activities for which no other person or entity could recover. Nevertheless, the holding in *Town of West Hartford* compels the Court to conclude that such costs do not constitute a cognizable RICO injury to Canada as a party to a commercial transaction, but, rather, constitute injury to Canada's general economy and its ability to carry out its functions. Because the cost of law enforcement pertains to general municipal functions rather than commercial activities, under *Town of West Hartford*, Canada may not recover for such damages under RICO. Absent any cognizable injury in fact, Canada does not have standing to assert the instant RICO claims.

#### 4. Injunctive Relief

Aside from its claim for monetary damages, Canada also seeks various forms of injunctive relief. Section 1964(c) limits private plaintiffs to damages and does not provide a basis upon which it may seek injunctive relief. *See* 18 U.S.C. § 1964(c); *Religious Technology Center v. Wollersheim*, 796 F.2d 1076 (9th Cir.1986), *cert. denied*, 479 U.S. 1103, 107 S.Ct. 1336, 94 L.Ed.2d 187 (1987); *Town of West Hartford v. Operation Rescue*, 726 F.Supp. 371, 376–78, rev'd on other grounds, 915 F.2d 92.

#### H. Supplemental Jurisdiction

Having dismissed Canada's federal causes of action at this early stage of the litigation, the Court declines to exercise supplemental jurisdiction over the common law fraud action. *See* 28 U.S.C. § 1367(c)(3); *see also Shenandoah v. United States Dep't of the Interior*, 159 F.3d 708, 714 (2d Cir.1998).[10]

### III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint in its entirety are **GRANTED.**

**IT IS SO ORDERED.**

---

10. Jurisdiction is lacking under 28 U.S.C. § 1332 because there is not complete diversity—on the one side is Canada and on the other is a Canadian corporation (RJR–Macdonald). *See Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 789 (2d Cir.1980) ("[T]he fact that alien parties [are] present on both sides ... destroy[s] complete diversity"), *cert. denied*, 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981); *see also* 28 U.S.C. § 1332(a).